862 F.2d 1449
 57 USLW 2427, 19 Envtl. L. Rep. 20,600
 Myra Holladay SIMS and Florida Import and Compliance
Association, Plaintiffs- Appellees,
v.
STATE OF FLORIDA, DEPARTMENT OF HIGHWAY SAFETY AND MOTOR
VEHICLES, Defendant- Appellant.
 No. 86-3055.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 11, 1989.
 
 Eric J. Taylor, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendant-appellant.
 William C. Owen, Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, P.A., Tallahassee, Fla., for amicus Fla. Automobile Dealers Assoc.
 Susan Greco Tuttle, Moffitt, Hart & Miller, Tampa, Fla., for amicus Import Automobile Dealers of Florida, Inc.
 Edward T. O'Donnell, Mershon, Sawyer, Johnson, Dunwody & Cole, Miami, Fla., for amicus Mercedes-Benz of North America, Inc.
 Robert P. Smith, Jr., Tallahassee, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of Florida.
 Before RONEY, Chief Judge, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, EDMONDSON and COX, Circuit Judges.
 HATCHETT, Circuit Judge:
 
 
 1
 We took this case in banc to determine whether Florida Statute 320.02(9) violates the Supremacy Clause and the Commerce Clause of the United States Constitution. Finding the statute unconstitutional, we affirm in part and reverse in part.[1]
 
 FACTS
 
 2
 On April 30, 1985, Myra Holladay Sims imported from Europe an automobile popularly known as a "gray market" automobile.[2] Gray market automobiles are imported automobiles which do not comply with United States emissions and safety standards. The Florida Import and Compliance Association (FICA) is a trade association whose members directly participate in importing and altering gray market automobiles.
 
 
 3
 Two federal statutes govern the importation of foreign manufactured automobiles into the United States. The Clean Air Act (42 U.S.C. Sec. 7522), and the Safety Act (15 U.S.C. Sec. 1397), bar the importation of motor vehicles which do not comply with the applicable federal emissions and safety standards. Specifically, the Clean Air Act prohibits
 
 
 4
 the sale, or the offering for sale, or the introduction, or delivery for introduction, into commerce, or (in the case of any person, except as provided by regulation of the Administrator), the importation into the United States, of any new motor vehicle or new motor vehicle engine, manufactured after the effective date of regulations under this part which are applicable to such vehicle or engine unless such vehicle or engine is covered by a certificate of conformity issued (and in effect) under regulations prescribed [by this statute].[3]
 
 
 5
 42 U.S.C. Sec. 7522(a)(1). Also, section 7522(b)(2) provides:
 
 
 6
 [t]he Secretary of the Treasury and the Administrator [of the Environmental Protection Agency (EPA) ] may, by joint regulation provide for deferring final determination as to admission and authorizing the delivery of such a motor vehicle or engine offered for import to the owner or consignee thereof upon such terms and conditions (including the furnishing of a bond) as may appear to them appropriate to ensure that any such motor vehicle or engine will be brought into conformity with the standards, requirements, and limitations applicable to it under this part. The Secretary of the Treasury shall, if a motor vehicle or engine is finally refused admission under this paragraph, cause disposition thereof in accordance with the customs laws unless it is exported, under regulations prescribed by such Secretary, within ninety days of the date of notice of such refusal or such additional time as may be permitted pursuant to such regulations, except that disposition in accordance with the customs laws may not be made in such manner as may result, directly or indirectly, in the sale, to the ultimate customer, of a new motor vehicle or new motor vehicle engine that fails to comply with applicable standards of the Administrator under this part.
 
 
 7
 Similarly, the Safety Act provides that "[n]o person shall manufacture for sale, sell, offer for sale, or introduce or deliver for introduction in interstate commerce, or import into the United States, any motor vehicle [unless it is in conformity with applicable federal motor vehicle safety standards]." 15 U.S.C. Sec. 1397(a)(1)(A). In addition, that statute provides:
 
 
 8
 [T]he Secretary of the Treasury and the Secretary [of the National Highway Transportation Safety Administration, Department of Transportation (DOT) ] may, by ... regulations, provide for authorizing the importation of such motor vehicle or item of motor vehicle equipment into the United States upon such terms and conditions (including the furnishing of a bond) as may appear to them appropriate to ensure that any such motor vehicle or item of motor vehicle equipment will be brought into conformity with any applicable federal motor vehicle safety standard prescribed under this subchapter, or will be exported or abandoned to the United States.
 
 
 9
 15 U.S.C. Sec. 1397(b)(3).
 
 
 10
 Despite general prohibitions against importing nonconforming motor vehicles into the United States, Congress, under the above provisions, authorized the importation of gray market vehicles upon the furnishing of a bond or other means of assuring that the importers and their customers do not circumvent the federal environmental safety laws. The EPA, the DOT, and the Treasury Department promulgated regulations governing such importation. See generally 19 C.F.R. Secs. 12.73, 12.80; 40 C.F.R. Part 85, Subpart P and 49 C.F.R. Part 571. Under these regulations, the authorities conditionally admit gray market vehicles into the United States for the limited purpose of enabling the importer to comply with federal emissions and safety laws. The importer must post an entry bond with the United States Customs Service (Customs) for an amount equal to the value of the vehicle plus the customs duty. See Automobile Importers Compliance Association, Handbook of Vehicle Importation, 21 (1984). In addition, the importer must sign a statement indicating that the motor vehicle "is not covered by a certificate of conformity with federal motor vehicle emission standards but will be brought into conformity with such standards." 19 C.F.R. Sec. 12.73(b)(5)(x) (1986). Finally, the importer must declare that the vehicle "was not manufactured in conformity [with] all applicable safety standards, but it has been or will be brought into conformity." 19 C.F.R. Sec. 12.80(b)(1)(iii).[4] The entry bond assists in enforcing the importer's obligation to comply with federal emission requirements and safety standards because Customs will not release the bond until it receives assurance from the EPA and the DOT that the importer has complied with the standards. See 19 C.F.R. Secs. 12.73c and 12.80e.
 
 
 11
 When Sims's automobile arrived in Jacksonville, Florida, she complied with the applicable federal regulations governing the importation of gray market vehicles, which included posting a bond in the requisite amount. The EPA exempted Sims from conforming her vehicle to the applicable federal emission standards and sent her a letter releasing the EPA obligation on the bond.[5] In complying with the Safety Act and the DOT regulations, Sims completed the requirements under 19 C.F.R. Sec. 12.80(b)(1)(iii).
 
 
 12
 In 1984, the Florida legislature passed the following statute concerning motor vehicle titling and registration:
 
 
 13
 Before a motor vehicle which has not been manufactured in accordance with the federal Clean Air Act and the federal Motor Vehicle Safety Act can be sold to a consumer and titled and registered in this state, the motor vehicle must be certified by the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency to be in compliance with these federal standards. A vehicle which is registered pursuant to this subsection shall not be titled as a new motor vehicle.
 
 
 14
 Act approved June 11, 1984, ch. 84-155, Sec. 3, 1984 Fla. Laws 457, 458 (codified as amended at Fla.Stat. Sec. 320.02(9) (1985)). This provision prevents a gray market vehicle owner from acquiring title and vehicle registration in Florida until the owner has obtained the required documentation from the federal government.
 
 
 15
 Subsequent to the passage of Fla.Stat. Sec. 320.02(9), Sims unsuccessfully sought to title and register her automobile at the Florida Department of Highway Safety and Motor Vehicles (DMV). The DMV refused to title and register Sims's vehicle because she did not produce release letters from the DOT and Customs certifying compliance with federal standards. Sims had not received a bond release letter from the DOT because the DOT had an excessive number of forms for review.[6]
 
 PROCEDURAL HISTORY
 
 16
 Following refusal to title and register the vehicle, Sims and the FICA filed suit in United States District Court for the Northern District of Florida alleging that the state's enforcement of section 320.02(9) violated the Supremacy and Commerce clauses of the United States Constitution: (1) the Clean Air Act and the Safety Act preempt the state's authority to require compliance with federal emission and safety standards, and (2) enforcement of section 320.02(9) impermissibly burdens foreign and interstate commerce. The district court concluded that the Clean Air Act and Safety Act preempt the state's authority to enforce section 320.02(9) and that enforcement of the statute would violate the commerce clause. The district court declared section 320.02(9) unconstitutional and enjoined its enforcement. The state brings this appeal from the district court's ruling.
 
 DISCUSSION
 
 17
 We first discuss those issues the parties presented to the district court, upon which the district court ruled, and the state of Florida initially appealed: the constitutionality of Florida Statute 320.02(9) under the Supremacy and Commerce clauses of the United States Constitution.[7]
 
 I. Supremacy Clause
 
 18
 Sims and the FICA successfully challenged the constitutionality of Fla.Stat. Sec. 320.02(9) in the district court. The district court held that the Clean Air Act and the Safety Act preempt the state's authority to require compliance with federal emission and safety standards. Federal preemption of state law is derived from the Supremacy Clause of article VI, clause 2, of the United States Constitution, which reads:
 
 
 19
 This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.
 
 
 20
 The Supreme Court stated the three ways in which federal law may preempt state law:
 
 
 21
 Federal law may preempt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. [Citation omitted.] Second, even in the absence of express preemptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the states must leave all regulatory activity in that area to the federal government. [Citations omitted.] Finally, if Congress has not displaced state regulation entirely, it may nonetheless preempt state law to the extent that the state law actually conflicts with federal law.
 
 
 22
 Michigan Canners and Freezers Association, Inc. v. Agricultural Marketing and Bargaining Board, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984).
 
 
 23
 We "acknowledge[d] the well established principle that the touchstone of preemption analysis is congressional intent...." Howard v. Uniroyal, Inc., 719 F.2d 1552, 1555 (11th Cir.1983). Additionally, we have noted that "[t]he intent of Congress to pre-empt a state law may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " Howard, 719 F.2d at 1556 (citing Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)).
 
 A. The Clean Air Act
 
 24
 The Clean Air Act contains the following preemptive provision regarding state enforcement of federal emission standards:
 
 
 25
 No state or any political subdivision thereof shall adopt of attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to [the vehicle emission standards of the Clean Air Act]. No state shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.
 
 
 26
 42 U.S.C. Sec. 7543(a). The express language in section 7543(a) indicates Congress's intent to exclusively regulate the control of new motor vehicle emissions prior to their initial sale. See Michigan Canners, 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399.
 
 
 27
 The state contends that Fla.Stat. Sec. 320.02(9) simply ensures that new motor vehicles coming onto Florida's highways comply with the Clean Air Act; it does not establish new or conflicting emission standards. Although the state may base its contention on proper and wholesome intentions, nevertheless, Congress specifically stated that "[n]o state ... shall adopt or attempt to enforce any [federal or state] standard relating to the control of emissions from new motor vehicles" prior to the initial sale. 42 U.S.C. Sec. 7543(a) (emphasis added). Thus, we agree with the district court's ruling and hold that "[e]nforcement of the Clean Air Act before [the] first sale [of new motor vehicles] is the sole and exclusive prerogative of the federal government."[8]
 
 B. The Safety Act
 
 28
 The Safety Act likewise contains a preemptive provision which reads in part:
 
 
 29
 Whenever a federal motor vehicle safety standard established under this subchapter is in effect, no state or political subdivision of a state shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the federal standard.
 
 
 30
 15 U.S.C. Sec. 1392(d). Unlike the preemptive provision contained in the Clean Air Act, this section precludes states from enforcement of safety standards only when such standards differ from federal standards.
 
 
 31
 The district court held that prior to a motor vehicle's first sale, "[t]he states are absolutely barred from acting in any manner whatsoever in" enforcing federal safety standards and that "the role of the states in enforcing the federal laws and regulations is confined solely to the period after the first sale of an automobile." We disagree with the district court.
 
 
 32
 The Safety Act does not expressly preclude states from requiring proof of compliance with federal safety standards before obtaining title and registration for gray market automobiles. The United States Supreme Court stated that "[t]he question whether the regulation of an entire field has been reserved by the federal government is, essentially, a question of ascertaining the intent underlying the federal scheme." Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. 707, 714, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 722 (1985). Congress enacted the Motor Vehicle Safety Act to establish uniform federal safety standards. See H.R. 1776, 89th Cong., 2d Sess. 17 (1966). The Safety Act as originally enacted, restricted federal enforcement of safety standards to the initial sale of new vehicles and permitted state enforcement of safety standards identical to corresponding federal standards after the first sale of new vehicles. S.Rep. No. 1301, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Admin.News 2709, 2720.
 
 
 33
 Also, the District Court for the Middle District of Pennsylvania held that the federal laws preempted state safety standards identical to federal standards because Congress intended to preclude states from presale enforcement of federal safety standards. Truck Safety Equipment Institute v. Kane, 466 F.Supp. 1242 (M.D.Pa.1979). The court in Kane, however, noted that the standards derived under the Pennsylvania system required independent testing and the payment of fees to cover the cost of such testing. Kane, 466 F.Supp. at 1245-46. Unlike the Pennsylvania regulations examined in Kane, section 320.02(9) does not impose requirements on a gray market vehicle importer beyond those imposed by the applicable federal standards.
 
 
 34
 In 1982, the National Highway Traffic Safety Administration (NHTSA) issued an opinion interpreting the extent to which the Safety Act preempted state enforcement of federal safety standards. Federal Motor Vehicle Safety Standards: Interpretation Regarding Preemption and Presale State Enforcement of Safety Standards, 47 Fed.Reg. 884 (Advisory Letter) (1982). In its interpretation, the NHTSA stated:
 
 
 35
 [I]t is the position of the NHTSA that any state requirement which necessitates that manufacturers pay fees in order to obtain approval under a state standard identical to an FMVSS [Federal Motor Vehicle Safety Standard], and any imposition of requirements for approval which has the effect of prescribing the sale of equipment certified under the Act to a standard such as FMVSS 218 would be preempted by operation of the Act and of the agency's action in adopting the federal standard in question.
 
 
 36
 47 Fed. Reg. at 885.
 
 
 37
 Recently, the Fifth Circuit examined a Texas statute similar in language to Fla.Stat. Sec. 320.02(9) and stated:[9]
 
 
 38
 H.B. 1805 places no burden on the manufacturer, which was clearly the concern behind the interpretation. H.B. 1805 does not involve the payment of any fees, nor does it have the effect of prescribing the sale of federally certified equipment. Indeed, H.B. 1805 does not require any certification except federal certification by federal authorities. As best we can tell, the original pre-1982 amendment provision was enacted to assure uniformity of standards for manufacturers so vehicles and equipment meeting the federal standards could be sold freely in any state. See remarks of Senator Magnuson (one of the NHTSA's sponsors), 112 Cong.Rec. S14230 (daily ed. June 14, 1966) (remarks of Senator Magnuson). The Texas statute. H.B. 1805, does not impair this objective since it creates no independent state standard or certification of the automobiles.
 
 
 39
 Direct Automobile Imports Association, Inc. v. Townsley, 804 F.2d 1408, 1414 (5th Cir.1986). The same rationale applies to Fla. Stat. Sec. 320.02(9). Section 320.02(9) does not impose additional requirements or burdens on the manufacturer or importer, nor does it require the payment of additional fees. Further, section 320.02(9) does not prescribe the sale of federally certified equipment or impair Congress's objective of establishing uniform federal safety standards to permit the free marketability of vehicles in all states.
 
 
 40
 In 1982, Congress added the following sentence to section 1392(d): "Nothing in this section shall be construed as preventing any state from enforcing any safety standard which is identical to a federal safety standard." 15 U.S.C. Sec. 1392(d) (1982). The Senate issued a report on the amendment which reads in part:
 
 
 41
 The committee intends that states are not preempted from enforcing safety standards identical to federal standards which they have adopted. States may not require [state] certification or approval of motor vehicles or motor vehicle equipment. However, state enforcement may be carried out according to applicable state laws. States may undertake independent testing, and also may require manufacturers to submit adequate test data concurrent with the first sale or thereafter. [Emphasis added.]
 
 
 42
 S. Rep. No. 505, 97th Cong., 2d Sess. 6, reprinted in 1982 U.S. Code Cong. & Admin. News 3169, 3174.
 
 
 43
 The District Court for the Northern District of Georgia addressed the constitutionality of Georgia statutes O.C.G.A. Secs. 40-2-25.1[10], 40-3-29.1[11], and 16-9-110[12] (1985) in light of 15 U.S.C. Sec. 1392(d) (1982). Georgia Automobile Importers Compliance Association, Inc. v. Bowers, 639 F.Supp. 352 (N.D.Ga.1986). In reviewing the legislative history of section 1392(d), the district court noted several statements made on the floor of the House of Representatives on the bill's passage which indicated congressional intent. Representative Wirth stated that "[a] recent court case and NHTSA opinion have changed the scope of traditional state enforcement." 128 Cong. Rec. H3438 (daily ed. June 14, 1982) (remarks of Rep. Wirth). Representative Moorhead considered the amendment to affirmatively declare states as having a role in enforcing federal safety standards. See 128 Cong. Rec. H3439 (daily ed. June 14, 1982) (remarks of Rep. Moorhead). In addition, Representative Dingell stated that under the amended section 1392(d) "states may undertake independent testing of vehicles or equipment and may require manufacturers to submit adequate data concurrently with the first sale within a state, or thereafter." 128 Cong. Rec. H3440 (daily ed. June 14, 1982) (remarks of Rep. Dingell).
 
 
 44
 We agree with the Fifth Circuit's conclusion in Townsley that "the legislative history shows an intent to preempt state presale enforcement of federal standards where the sale of federally certified equipment is impaired by an independent state compliance system." Townsley, 804 F.2d at 1415. Fla. Stat. Sec. 320.02(9) does not impair the enforcement of federal safety standards or frustrate Congress's intent of establishing uniform standards for vehicle manufacturers; consequently, we hold that the Safety Act, as amended, does not preempt Fla. Stat. Sec. 320.02(9) (1985).
 
 II. Commerce Clause
 
 45
 Although we hold that the Safety Act does not preempt the Florida Statute, we earlier held that the federal government solely and exclusively may enforce the Clean Air Act before a vehicle's first sale. Consequently, the Clean Air Act preempts Florida Statute 320.02(9), rendering this Florida statute unconstitutional. In light of this holding on the preemption issue, we need not decide the statute's constitutionality under the Commerce Clause.[13]
 
 III. Jurisdictional Issues
 
 46
 We now turn to the jurisdictional issues of standing, mootness, and sovereign immunity.[14]
 
 A. Standing
 
 47
 The state of Florida contends that Sims and the FICA lack standing to challenge the constitutionality of Fla.Stat. Sec. 320.02(9) because they failed to show (1) a judicially cognizable injury traceable to the statute's enforcement, and (2) a likelihood of redress if we declare the statute unconstitutional. "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). To satisfy the standing requirement, a plaintiff must allege a personal injury fairly traceable to the challenged conduct and a likelihood that the requested relief will redress such injury. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).
 
 
 48
 The Supreme Court requires the courts to "accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party." Warth, 422 U.S. at 501, 95 S.Ct. at 2206; see Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). In satisfying the initial article III standing requirement--an allegation of "a distinct and palpable injury," Sims and the FICA allege that the state's enforcement of section 320.02(9) unlawfully prevents titling and registering gray market vehicles in Florida. See Warth, 422 U.S. at 501, 95 S.Ct. at 2206. Assuming, as we must, the truth of these allegations, the state's unlawful refusal to issue titles and registrations to owners of gray market vehicles constitutes a distinct and palpable personal injury to Sims and the FICA.
 
 
 49
 Sims and the FICA make additional assertions sufficient to establish the second standing requirement--the requested relief's likelihood of redress. Absent section 320.02(9), Florida would title and register Sim's and other owners gray market vehicles.
 
 
 50
 The state's standing contention has no merit. We must determine standing at the time a plaintiff files suit. Deposit Guaranty National Bank v. Roper, 445 U.S. 326, 332, 100 S.Ct. 1166, 1170, 63 L.Ed.2d 427, 435 (1980). At the time Sims filed this lawsuit, Sims owned the vehicle that Florida refused to title. The state relied on the statute for its refusal. Who suffers a greater injury than the owner to whom the state denies title and registration? Likewise, Sims prayed that the district court declare the statute unconstitutional and enjoin its future enforcement. The district court provided this relief.
 
 
 51
 As to the FICA's standing, we must determine its members' involvement in importing and marketing gray market automobiles. According to the complaint, FICA members include
 
 
 52
 persons and Florida business entities who support improving opportunities for commerce with foreign nations in the importation, use and sale in the United States of foreign-manufactured automobiles that are converted in this country to comply with emission and safety standards of the Clean Air Act and the Vehicle Safety Act. Plaintiff FICA's members include importers of automobiles for their personal use as well as importers for sale, or dealers; brokers of import transactions; owners and operators of automotive conversion and compliance facilities, equipped to comply with safety standards established pursuant to the Vehicle Safety Act; and owners and operators of specialized automotive testing laboratories, equipped to comply or verify compliance with emission standards established pursuant to the Clean Air Act.
 
 
 53
 If owners, importers for personal use, importers for sale, dealers, brokers, automotive conversion mechanics, and compliance testing laboratories involved in the gray market vehicle business do not have standing to challenge the statute, then no individual or entity would have the requisite standing.
 
 B. Mootness
 
 54
 The mootness issue need not cause delay.[15] We have ruled that Sims and the FICA have standing to bring this suit. Mootness and standing are related doctrines. Where a party challenges standing, the court inquires whether the plaintiff is entitled to relief. Where mootness is at issue, the court determines whether judicial activity remains necessary. Warth v. Seldin, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343 (1975). Mootness demands that the plaintiff's personal interest in the lawsuit (standing) continue to the lawsuit's end.
 
 
 55
 This case undoubtedly is not moot as to the FICA. The FICA presently has the same personal interest and stake in the lawsuit as it did on the date of filing. The FICA's members continue importing, converting, testing, and selling gray market vehicles. The Florida statute still delays the effective conduct of FICA members' businesses.
 
 
 56
 The state failed to make the only possible mootness argument regarding Sims. Sims received the bond release letter on September 18, 1985, after the district court trial which held the statute unconstitutional. One could argue that Sims's case became moot when she received the documents prior to the state's appeal. Because we decide the statute's constitutionality in this opinion, this argument simply asserts that a gray market vehicle owner could never attack the Florida statute; the state could deliver the documents at any time, even after trial, resulting in the lawsuit's dismissal. The court would never determine the statute's constitutionality in a gray market vehicle owner's lawsuit because of litigation's inherent length and delays.
 
 
 57
 Although such an argument is legally and logically specious, we need not rely on its specious nature. The Supreme Court established the doctrine of "capable of repetition yet evading review" for application to mootness issues. Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). This doctrine allows federal jurisdiction to continue where seemingly no continuing controversy exists. The Supreme Court held that mootness does not apply in these "exceptional circumstances" if a plaintiff can demonstrate that the alleged injury is capable of repetition, but time constraints or other circumstances preclude the court's review. DeFunis, 416 U.S. at 318-19, 94 S.Ct. at 1706-07. Sims's injury is capable of repetition. The record shows that individuals import thousands of gray market vehicles into the United States each year. All of these vehicle owners who seek title and registration in Florida will suffer the same injuries as Sims, and similarly find themselves unable to attack the statute because the state ultimately, even after trial, delivers the documents. Consequently, effective review of an owner's claim would never occur if we hold that delivery of the documents at any time, even after trial renders the owner's claim moot.
 
 
 58
 This action is not moot.
 
 C. Immunity
 
 59
 Sims and the FICA filed suit in the district court naming as defendants the State of Florida, the Department of Highway Safety and Motor Vehicles, and the Attorney General. Sims and the FICA then filed an uncontested motion to dismiss the Attorney General as a defendant. The parties never named as a defendant the Director of the Division of Motor Vehicles, Florida Department of Highway Safety and Motor Vehicles. Thus, the State of Florida and one of its agencies--the Department of Highway Safety and Motor Vehicles remain the only defendants in this action. "It is clear ... that in the absence of consent a suit in which the state or one of its agencies or departments is named as the defendant is prescribed by the eleventh amendment." Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984).
 
 
 60
 The state of Florida failed to plead sovereign immunity under the eleventh amendment as a defense to this constitutional challenge. The state never mentioned the eleventh amendment, not even at trial. In addition, the state did not initially raise the issue on appeal, but only raised sovereign immunity after this court requested that the parties brief the issue.
 
 
 61
 Sims and the FICA contend that this court unwarrantedly raised the eleventh amendment defense. They rely on the Supreme Court's statement: "[W]e have never held that [the eleventh amendment defense] is jurisdictional in the sense that it must be raised and decided by this court on its own motion." Patsy v. Board of Regents of the State of Florida, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172, 187 n. 19 (1982).
 
 
 62
 In response to the state's late and compelled sovereign immunity defense, Sims and the FICA moved this court to add the Director of the Division of Motor Vehicles as a defendant. We grant this motion, even though we would remand the sovereign immunity issue to the district court in other circumstances.[16] In this case, however, in light of the state's initial waiver of the defense, the state's reluctance to urge the issue before the in banc court, and the lack of prejudice to the state and its officials, the district court would clearly abuse its discretion if it denied the motion to formally add as a defendant the Director of the Division of Motor Vehicles for the State of Florida.
 
 CONCLUSION
 
 63
 In summary, we affirm the district court's ruling that Fla. Stat. Sec. 320.02(9) violates the Clean Air Act, 42 U.S.C. Sec. 7522 because Congress has exclusively reserved to the federal government the enforcement of federal emission standards. We reverse the district court's ruling that Fla. Stat. Sec. 320.02(9) violates the Safety Act. Accordingly, we affirm in part and reverse in part.[17]
 
 
 64
 AFFIRMED in part and REVERSED in part.
 
 
 65
 TJOFLAT, Circuit Judge, dissenting in which HILL, KRAVITCH and EDMONDSON, Circuit Judges, join:
 
 
 66
 In its apparent haste to decide the constitutionality of Fla.Stat. Sec. 320.02(9) (1987), the en banc court glosses over the jurisdictional requirements of well established precedent, and in so doing sets the stage for untold mischief in future cases. I respectfully dissent on four separate grounds.
 
 
 67
 First, in an effort to circumvent the eleventh amendment bar to this suit, the court, acting sua sponte, substitutes an individual for the State of Florida as the party defendant and then, without giving him notice and an opportunity to be heard, enters judgment against him. This maneuver, which has no foundation in the law, denies the newly named defendant due process in the most elementary and fundamental sense. Second, the majority today decides a case which is plainly moot with respect to one of the two appellees, Myra Holladay Sims. Third, the majority entertains a claim that the remaining appellee, Florida Import and Compliance Association (FICA), lacks standing to assert. Finally, although Sims' and FICA's claims were cast as a case arising under the Constitution and laws of the United States, they are actually state law claims that raise a constitutional question in anticipation of a defense. These claims thus fall outside of the court's subject matter jurisdiction.
 
 
 68
 Because a full understanding of the claims that Sims and FICA present is essential to the proper resolution of these issues, for purposes of convenience I begin in part I with an analysis of their claims which illustrates that the district court lacked subject matter jurisdiction to entertain this case. My subsequent remarks are organized as follows: In part II, I address the mootness of Sims' claim; in part III, I discuss FICA's lack of standing; and in part IV, I criticize the court's decision to substitute an individual for the State as the party defendant without affording him any of the rudiments of due process.
 
 I.
 
 69
 The complaint in this case presents two separate and distinct claims against the State of Florida: one brought by Sims, the other by FICA. In an effort to give the district court subject matter jurisdiction, Sims and FICA cast their claims as if they arose under the Constitution or laws of the United States, see 28 U.S.C. Sec. 1331 (1982).[1] Their claims, however, are not based on the Constitution or laws of the United States; rather, they are based on state law.
 
 
 70
 Sims alleges that under Florida law, the State, through its Department of Highway Safety and Motor Vehicles (the Department), is required to title and register[2] her gray market automobile because she has satisfied the requirements Florida imposes on those who wish to title non-gray market automobiles, but that the State refuses to do so. See Fla.Stat. Sec. 320.02(1)-(7). Anticipating the State's defense, Sims goes on to allege that the State has refused to title her vehicle because she has not complied with Fla.Stat. Sec. 320.02(9) by providing the Department with proof, in the form of a bond release letter issued by the National Highway Transportation Safety Administration (NHTSA), that she has satisfied the requirements of the Federal Motor Vehicle Safety Act, 15 U.S.C. Sec. 1397 (1982). Finally, in response to this anticipated defense, Sims presents the federal question that, she contends, gives the district court, and consequently this court, subject matter jurisdiction to entertain her suit: whether Fla.Stat. Sec. 320.02(9) is unconstitutional. In effect, Sims asks the court to strike the State's defense as legally insufficient, see Fed.R.Civ.P. 12(f), and to issue an order compelling the Department to title her gray market automobile.[3]
 
 
 71
 FICA's claim, which is brought solely in a representative capacity for two groups of claimants,[4] also arises under state, not federal, law. The first group of claimants consists of members who will both import gray market automobiles into Florida and satisfy Florida's requirements for titling non-gray market automobiles. The second group of claimants consists of FICA members, namely import brokers and mechanics, who charge fees to those who import gray market automobiles after their automobiles are conditionally admitted into the United States. These members contend that enforcement of Fla.Stat. Sec. 320.02(9) is chilling importation of gray market automobiles and thus is causing them to lose business. Unlike Sims, however, no one in either group of FICA claimants seeks an order requiring the Department to title any existing gray market automobile. Rather, they seek an order requiring the Department to title any gray market automobile that may be imported into Florida in the future.
 
 
 72
 Once properly characterized, Sims' and FICA's claims obviously run afoul of the "well-pleaded complaint rule," which prohibits a claimant from invoking the district court's federal question jurisdiction by alleging that the defense that the defendant will raise is invalid under federal law. See C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3566 (1984). In the seminal case of Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), the Supreme Court stated:
 
 
 73
 It is not enough that the plaintiff alleges some anticipated defense to his cause of action, and asserts that the defense is invalidated by some provision of the Constitution of the United States. Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution.
 
 
 74
 Id. at 152, 29 S.Ct. at 43. The Supreme Court has not wavered in its firm application of this rule, see, e.g., Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 9-11, 103 S.Ct. 2841, 2846-47, 77 L.Ed.2d 420 (1983); Phillips Petroleum Co. v. Texaco, Inc., 415 U.S. 125, 127-28, 94 S.Ct. 1002, 1004, 39 L.Ed.2d 209 (1974), and we are bound to follow it.
 
 
 75
 In sum, the claims Sims and FICA present are founded on state law--the right to receive a title to an automobile is a creature of the Florida legislature, not the Constitution or laws of the United States.[5] The federal questions they raise concern only the constitutionality of the State's defense. In accord with the decision in Mottley, we should notice sua sponte the absence of subject matter jurisdiction and direct the district court, on receipt of our mandate, to dismiss the case.[6]
 
 II.
 
 76
 I turn now to the issue of the mootness of Sims' claim. At the heart of this controversy is Sims' impatience with NHTSA's delay in issuing a bond release letter, required by Fla.Stat. Sec. 320.02(9) to title a gray market automobile.[7] The majority acknowledges that on September 18, 1985--one week after trial and three months before the district court entered final judgment for Sims--NHTSA issued Sims her eagerly awaited bond release letter. Since Sims had already acquired the necessary documentation from the Environmental Protection Agency, she now had all the documents required by Fla.Stat. Sec. 320.02(9), and nothing prevented her from obtaining a title for her automobile. Sims' attorney should have advised the court of this development immediately;[8] had he done so, the court would have asked counsel whether there was any need to continue the litigation, given that Sims had the power to obtain the precise relief she was asking the court to provide. There can be no question that had the trial court been so informed, it would have dismissed Sims' claim as moot.[9]
 
 
 77
 Unfortunately, the fact that Sims' claim had become moot did not surface until oral argument before the three-judge panel which initially heard this appeal. During that argument, Sims' attorney, in response to an inquiry from the court, confessed that his client had received the NHTSA bond release letter prior to the entry of final judgment in the district court, and that the controversy with the State over her automobile had ended.[10] Sims' attorney nonetheless urged the panel to proceed with the appeal and rule on the constitutionality of the Florida statute, contending that Sims' controversy with the State was not moot because it was capable of repetition, yet evading review.
 
 
 78
 The majority agrees with Sims that her case was not moot when the district court decided it. The majority does so by incanting the phrase "capable of repetition, yet evading review," ante at 1459, as if that phrase possessed some talismanic power to create an article III controversy where, in truth, one does not exist. We know, of course, that the phrase contains no such power; rather, the doctrine merely defines those situations in which a seemingly moot case still meets article III's requirement of a genuine, concrete controversy. As the Supreme Court observed in Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983), and DeFunis v. Odegaard, 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974), these situations are "exceptional" and require the plaintiff to prove that the doctrine's two requisites are met. See Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975).
 
 
 79
 Because Sims' claim became moot before the district court entered final judgment, we must look to the record as it stood when the court entered judgment in determining whether the claim was capable of repetition, yet evading review. If that record discloses evidence from which the court could reasonably have concluded that the claim was likely to recur and, if so, would evade review, then the district court had the authority to adjudicate the claim.
 
 
 80
 The record discloses no evidence to satisfy the first requirement of the doctrine, that the claim is likely to recur; consequently, we need not determine whether the second requirement, evading review, has been met. What the record reveals is a controversy involving a single automobile, a 1976 Mercedes-Benz 450 SEL, that Sims brought to the Port of Jacksonville on April 30, 1985. There is simply nothing in Sims' complaint or her testimony at trial from which the district court could have found that this controversy might recur,[11] much less, as the cases require, that there was a "reasonable likelihood" or "demonstrated probability" that Sims would assert the same claim against the State at some time in the future. See Honig v. Doe, --- U.S. ----, ---- n. 6, 108 S.Ct. 592, 601 n. 6, 98 L.Ed.2d 686 (1988). The majority does not even attempt to say how Sims' claim might satisfy this requirement--because, I believe, the attempt would be futile.[12] Instead, the majority simply states that the record shows that a number of other individuals will import gray market automobiles into Florida and will suffer the same injuries as Sims. Because this is not a class action, a showing of future injury to others is immaterial to the issue of whether Sims' claim will, itself, recur. The law therefore requires that we dismiss Sims' claim as moot because she has not shown a "reasonable likelihood" or "demonstrated probability" that it will recur.
 
 III.
 
 81
 Because Sims' claim is moot, we have jurisdiction to entertain this appeal only if the remaining appellee, FICA, has standing on its own to attack Fla.Stat. Sec. 320.02(9). The standing doctrine, like the mootness doctrine,[13] is an aspect of article III's "case or controversy" requirement. As the Supreme Court has stated:
 
 
 82
 the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the "controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action."
 
 
 83
 Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2205, 40 L.Ed.2d 343 (1975) (citations omitted).
 
 
 84
 FICA concedes that it is not injured by the Department's enforcement of the statute and consequently does not assert on its own behalf the statute's unconstitutionality.[14] FICA contends, however, that the Department's enforcement of the statute affects a number of its members and argues that it may litigate their claims in a representative capacity.[15]
 
 
 85
 Although an association such as FICA may, in some circumstances, have "representative standing" to litigate the claims of its members, see Warth, 422 U.S. at 511, 95 S.Ct. at 2211-12, it may do so only if its members would have standing in their own right, had they brought suit themselves. See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343-45, 97 S.Ct. 2434, 2441-42, 53 L.Ed.2d 383 (1977).[16] For the members of FICA to have standing in their own right, they would have to show that they have suffered an actual or threatened injury that is legally cognizable, fairly traceable to the allegedly illegal conduct, and likely to be redressed by a favorable decision. Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); see also Allen v. Wright, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984).
 
 
 86
 FICA attempts to meet its burden of establishing its members' standing by alleging that Fla.Stat. Sec. 320.02(9) injures its members who import gray market automobiles for commercial or personal use by denying them the right to obtain Florida title, and in effect, the right to drive their gray market automobiles. With respect to its other members--import brokers and mechanics--FICA alleges that they are injured indirectly: because the statute effectively prohibits owners from titling and driving their gray market automobiles pending final admission into the United States, Florida residents may no longer wish to import gray market automobiles; as a result, the business of the import brokers, who assist owners in the importation of gray market automobiles, and of the mechanics, who modify such automobiles to bring them into compliance with federal emissions and safety standards, will decline. On the basis of these allegations, FICA represents that its "members would have standing to sue in their own right for the relief requested."
 
 
 87
 In my view, FICA's allegations of fact are insufficient as a matter of law to demonstrate that FICA has standing to challenge the State's enforcement of the statute on behalf of either group of members. I make this statement after accepting as true FICA's allegations of fact regarding standing, as Warth commands.[17]
 
 
 88
 FICA lacks standing to sue in behalf of the first group--the importers--because the complaint does not identify anyone who has been or will be denied title as a result of the Department's enforcement of Fla.Stat. Sec. 320.02(9). Indeed, all that the complaint alleges is that "importers of automobiles for their personal use as well as ... for resale ... support improving opportunities for commerce with foreign nations in the importation, use and sale in the United States of foreign-manufactured automobiles"[18] and, presumably, want Fla.Stat. Sec. 320.02(9) declared unconstitutional. This allegation, by itself, is plainly insufficient to establish injury to the importers.
 
 
 89
 The importers' case is indistinguishable from the home builders association's case in Warth v. Seldin. In Warth, the Rochester Home Builders Association (Home Builders) brought suit against the town of Penfield, New York. Home Builders contended that the town's ordinance prohibiting low-income housing deprived its members of "substantial business opportunities and profits,"Warth, 422 U.S. at 515, 95 S.Ct. at 2213, and sought an order enjoining the ordinance's enforcement. Home Builders alleged that its members were injured by the ordinance, but failed to identify any member who had attempted to build a low-income housing project in Penfield. The district court dismissed Home Builders' complaint for lack of standing. The Court of Appeals for the Second Circuit affirmed. Home Builders thereafter sought review in the Supreme Court.
 
 
 90
 The Supreme Court agreed with the conclusion of the lower courts and held that Home Builders lacked standing to attack the ordinance. The Court stated:
 
 
 91
 [Home Builders] can have standing as the representative of its members only if it has alleged facts sufficient to make out a case or controversy had the members themselves brought suit. No such allegations were made. The complaint refers to no specific project of any of its members that is currently precluded either by the ordinance or by respondents' action in enforcing it. There is no averment that any member has applied to respondents for a building permit or a variance with respect to any current project. Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by Home Builders' members, or that any of its members has taken advantage of the remedial processes available under the ordinance. In short, ... Home Builders has failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention.
 
 
 92
 Warth, 422 U.S. at 516, 95 S.Ct. at 2214. Similarly, in Anderson v. City of Alpharetta, 770 F.2d 1575, 1582-83 (11th Cir.1985), we affirmed the district court's holding, which followed Warth 's analysis, that an organization that operated a service to find housing for low-income minority families lacked standing to challenge a statute that forestalled development of a particular housing project because the organization failed to allege that any specific individual had sought, or would seek, housing in the area of the project. In the case before us, as in Warth and Anderson, no factual basis exists in the record to support a finding that FICA's members have been or will be injured.[19] In the absence of such a basis, we must conclude that FICA lacks standing to maintain this suit on behalf of its members who import gray market automobiles for personal or commercial use.
 
 
 93
 Nor has FICA demonstrated that it has standing to sue on behalf of its second group of members--import brokers and mechanics. FICA has not identified any one in this group whose business has been adversely affected by the enforcement of Fla.Stat. Sec. 320.02(9). Furthermore, even if FICA had identified someone, there are two reasons why such member, and thus FICA, would lack standing to challenge the statute.
 
 
 94
 First, the indirect injury the import brokers and mechanics allege that they will suffer is too remote and uncertain to constitute the "injury in fact" required for standing. The possibility that the future enforcement of the statute may cause a significant decrease in the importation of gray market automobiles and that, as a consequence, the import brokers and mechanics may suffer a loss of business is highly speculative, and " 'unadorned speculation will not suffice to invoke the federal judicial power.' " Diamond v. Charles, 476 U.S. 54, 66, 106 S.Ct. 1697, 1705, 90 L.Ed.2d 48 (1986) (denying standing to a pediatrician who argued that enforcement of a law requiring doctors to preserve the lives of aborted fetuses would enlarge the pool of his potential fee-paying patients) (citing Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976)). The burden is on the plaintiff to allege concrete injury that is "distinct and palpable" and not "abstract" or "hypothetical." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).
 
 
 95
 If, as a matter of policy, we were to follow the majority's approach and disregard this limitation on the standing of those alleging indirect injury, then we would also have to recognize the claims of anyone else who might allege that the enforcement of Fla.Stat. Sec. 320.02(9) hurt his business. I can think of scores of possible plaintiffs who could allege that "but for" the State's enforcement of the statute, they would have been better off economically: the banks that would have financed the purchase of the gray market automobiles that were not imported; the banks' employees; the Port of Jacksonville that would have received the automobiles that were not imported; the Port's employees; the shipping, trucking, and rail companies that would have transported the imported automobiles to their ultimate destination. In short, under the majority's approach to standing, the universe of possible plaintiffs is endless.
 
 
 96
 Even if the import brokers and mechanics could show that they suffer a sufficiently concrete injury, their standing in this case has a second defect: the right which they seek to assert--the right to obtain title to a gray market automobile--is not theirs, but rather belongs to the automobile owners. Prudential limitations on the standing doctrine require that "the plaintiff generally must assert his own legal rights or interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499, 95 S.Ct. at 2205; see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S.Ct. 2965, 2970, 86 L.Ed.2d 628 (1985); Secretary of State v. Joseph H. Munson Co., 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984). The reasons for this rule are twofold. "The limitation 'frees the Courts ... from premature interpretations of statutes in areas where their constitutional application might be cloudy,' and it assures the court that the issues before it will be concrete and sharply presented." Joseph H. Munson, 467 U.S. at 955, 104 S.Ct. at 2846 (citing United States v. Raines, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960)).[20] This rule requires us to hold that the import brokers and mechanics do not have third party standing to challenge Fla.Stat. Sec. 320.02(9).
 
 
 97
 Finally, I address the majority's assertion that if the various groups of FICA members "do not have standing, then no individual or entity would have the requisite standing." Ante at 1459. The majority makes this assertion, in a last ditch effort to find standing for FICA's claim, squarely in the face of Supreme Court pronouncements that such an assertion is meaningless. As the Supreme Court has repeatedly stated, " '[t]he assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing.' " Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982) (quoting Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974)).
 
 
 98
 To summarize, I conclude that none of FICA's members have standing to challenge Fla.Stat. Sec. 320.02(9). FICA therefore lacks "representational standing" to challenge the statute on their behalf. Because Sims' claim is moot and FICA lacks standing, no "case or controversy" exists over which this court may exercise its judicial power. We therefore should remand this case to the district court with the instruction that it be dismissed.
 
 IV.
 
 99
 This case began as a suit against the State and one of its agencies--a suit barred by the eleventh amendment.[21] It is well settled that, in the absence of the state's consent, only suits seeking injunctive relief against a named state official, as opposed to a state department or agency, are exempted from the eleventh amendment proscription. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984). The complaint filed by Sims and FICA does not fall within this exemption because it did not name the director of the Department of Highway Safety and Motor Vehicles or any other state official as a party defendant.[22] The majority recognizes that this suit cannot be maintained against the named defendants--the State of Florida and the Department.[23] Yet, instead of vacating the district court's judgment and remanding the case to the district judge for the entry of a judgment of dismissal,[24] the majority, acting sua sponte, simply substitutes an individual--the director of the Department[25]--for the State as the party defendant, and then enters judgment against him. As the following discussion manifests, the majority's maneuver, which is accomplished without any advance notice to the director, is not only unprecedented, it is unprincipled, constituting a denial of due process in the most elementary and fundamental sense.
 
 
 100
 Due process--for that matter common sense--requires that an individual against whom a permanent injunction is to be entered be given notice of the claims against him and an opportunity to be heard. See generally Fed.R.Civ.P. 65; see also C. Wright & A. Miller, Federal Practice and Procedure Sec. 2956 (1973). Where, as here, the individual does not voluntarily appear in the case and consent to the entry of judgment, due process requires that he be served with process and given a chance to respond to his adversary's claim. To me, this notion is "due process in the primary sense," Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J.) (quoting Brinkerhoff-Faris Trust & Savings Co. v. Hill, 281 U.S. 673, 681, 50 S.Ct. 451, 454, 74 L.Ed. 1107 (1930)). "It is a rule as old as the law ... that no one shall be personally bound until he has had his day in court." Galpin v. Page, 85 U.S. (18 Wall.) 350, 368, 21 L.Ed. 959 (1873).
 
 
 101
 I have no doubt that the judges making up the majority subscribe to this principle of fairness. They could have honored this principle by vacating the district court's judgment and remanding the case to the district court with instructions that that court either dismiss the plaintiffs' suit without prejudice or permit the plaintiffs to amend their complaint, substitute the director of the Department as the party defendant, and begin their case anew--as I have noted. See supra note 24. But this would have denied the majority the power, under article III, of deciding the constitutionality of Fla.Stat. Sec. 320.02(9). The majority knows that if we were to decide the constitutionality of this statute and at the same time vacate the district court's judgment, we would be rendering an archetypical provisional decision--the sort of decision article III precludes us from making. See Escambia County v. McMillan, 466 U.S. 48, 51, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984) (Federal courts do not decide constitutional questions unnecessarily.); Flast v. Cohen, 392 U.S. 83, 96, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968) (" '[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.' ") (quoting C. Wright, Federal Courts 34 (1963)). Our decision would be provisional because it would take effect only if the district court, on remand, granted the plaintiffs leave to amend, rejected the jurisdictional arguments I have advanced here, and reached the merits of the plaintiffs' constitutional attack on the Florida statute. Only then would our provisional decision have meaning; it would be persuasive authority for the decision on the merits that the district court would then be called upon to make.
 
 
 102
 The only way the majority can decide this case without transgressing article III's prohibition against provisional decisions is to do what it has done: substitute the director of the Department for the State as the party defendant and treat the district court's judgment as having been entered against him. This is not a case, however, in which the law permits such a substitution. A court of appeals can substitute a state official as the party defendant only in cases in which his predecessor in office has been sued in his official capacity. In such cases, Fed.R.App.P. 43(c)(1) provides for substitution automatically; the successor official becomes bound to the district court's judgment without being served with process and accorded a hearing. A hearing is not required because the law presumes that the successor's interest, qua office holder, has been fully represented in the proceedings by his predecessor.
 
 
 103
 This is, instead, a case in which the new party's predecessor has never appeared in the case; consequently, due process requires that the new party be served with process and provided an opportunity to be heard. This is the necessary, and plain, implication of Rule 43(c)(1): unless the new party is the "successor" of a "public officer" who has been sued "in his official capacity," due process precludes his automatic substitution at the appellate level as inherently prejudicial.
 
 
 104
 The majority circumvents Rule 43(c)(1) by fashioning a new rule: a state official may be substituted for the state as the party defendant where the state fails to plead the sovereign immunity defense in the district court and is reluctant to urge the defense on appeal, and neither the state nor its substituted official will be prejudiced by the substitution.[26] The majority's rule is bizarre and illegal. The majority implies that it would have granted the director the right to service of process and a hearing--in the district court--if the state had not "reluctantly" raised the sovereign immunity defense. The majority also implies that it would have granted the director such fundamental due process if its sua sponte issuance of the injunction against the director,[27] and its subjection of him to the district court's contempt power, worked any prejudice against him.
 
 
 105
 Finally, even if it could be said that the majority's new rule is valid--that it passes constitutional muster and is not foreclosed by Rule 43(c)(1)--I would remand the case to the district court to accord the director his due process rights. I would do so because, contrary to the majority's view, (1) the State's urging of the sovereign immunity defense has not been "reluctant," and (2) enjoining a state officer without notice and an opportunity to be heard is inherently prejudicial.
 
 V.
 
 106
 For the foregoing reasons, I respectfully dissent.
 
 COX, Circuit Judge, dissenting:
 
 107
 I concur in Part IV of Judge Tjoflat's dissenting opinion, and I would not reach the other issues presented.
 
 
 
 [1]
 By our rules, we vacated the panel opinion, 832 F.2d 1558, at 840 F.2d 778 (11th Cir.1988)
 
 
 [2]
 Sims purchased the used 1976 Mercedes Benz 450 SEL from Ulrich Kieserwalter of Bonn, West Germany
 
 
 [3]
 The Clean Air Act does not define "new car" as it relates to gray market automobiles by considering whether the automobile has previously been sold prior to its importation into the United States:
 (3) Except with respect to vehicles or engines imported or offered for importation, the term 'new motor vehicle' means a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser; and the term 'new motor vehicle engine' means an engine in a new motor vehicle or a motor vehicle engine the equitable or legal title to which has never been transferred to the ultimate purchaser; and with respect to imported vehicles or engines, such terms mean a motor vehicle and engine, respectively, manufactured after the effective date of a regulation issued under section 7521 of this title which is applicable to such vehicle or engine (or which would be applicable to such vehicle or engine had it been manufactured for importation into the United States ).
 42 U.S.C. Sec. 7550(3) (emphasis added).
 
 
 [4]
 Title 19 C.F.R. Sec. 12.80(b)(1)(iii) reads:
 (b) Requirements for entry and release.
 (1) [E]ach vehicle ... offered for introduction into the Customs territory of the United States shall be denied entry unless the importer or consignee files with the entry a declaration, in duplicate, which declares or affirms one of the following:
 ....
 (iii) The vehicle or equipment item was not manufactured in conformity [with] all applicable safety standards, but it has been or will be brought into conformity. Within 120 days after entry, or within a period not to exceed 180 days after entry, if additional time is granted by the Administration, National Highway Traffic Safety Administration ("Administrator, NHTSA"), the importer or consignee will submit a true and complete statement to the Administrator, NHTSA, identifying the manufacturer, contractor, or other person who has brought the vehicle or equipment item into conformity, describing the exact nature and extent of the work performed, and certifying that the vehicle or equipment item has been brought into conformity, and that the vehicle or equipment item will not be sold or offered for sale until the Administrator, NHTSA, issues an approval letter to the district director stating that the vehicle or equipment item described in the declaration has been brought into conformity with all applicable safety standards.
 
 
 [19]
 C.F.R. Sec. 12.80(b)(1)(iii)
 
 
 [5]
 The importer of a vehicle, more than five years old and imported for personal use and not for resale, is entitled to a once-in-a-lifetime exemption from the Clean Air Act's emission standards. The EPA automatically grants the exemption, but the importer is still required to comply with the requirements of the Safety Act and the DOT. In addition, the laws prohibit the importer from selling the vehicle for two years after importation. See generally United States EPA, Automotive Imports--Fact Sheet 76 (1983)
 
 
 [6]
 In July, 1985, the DOT had 14,000 compliance forms for review
 
 
 [7]
 The parties did not present the jurisdictional issues which we later address to the district court, but the panel (Judges Tjoflat, Hatchett, and Eaton) raised them at oral argument. The parties briefed and argued these jurisdictional issues before the in banc court
 
 
 [8]
 The district court additionally noted that section 7543(d) of the Clean Air Act further indicates Congress's intent to exclusively enforce federal emission standards relating to new automobiles before their initial sale because the statute specifically allows the state to regulate automobile use and operation subsequent to the initial sale. Title 42 U.S.C. Sec. 7543(d) reads: "Nothing in this part shall preclude or deny to any state or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." [Emphasis added.]
 
 
 [9]
 Texas statute, H.B. 1805 provides:
 Before a motor vehicle not manufactured for sale or distribution in the United States may be registered and titled in Texas, the applicant shall furnish to the designated agent: (1) a bond release letter, with all attachments, issued by the United States Department of Transportation acknowledging receipt of a statement of compliance submitted by the importer of the vehicle and that the statement meets the safety requirements of 19 C.F.R. 12.80(e); and (2) a bond release letter, with all attachments, issued by the United States Environmental Protection Agency stating that the vehicle has been tested and shown to be in conformity with federal emission requirements; and (3) a receipt of certificate issued by the United States Department of Treasury showing that any and all gas guzzler taxes due on the vehicle under the provisions of Pub.L. No. 95-618, Title II, Section 201(a) (16 U.S.C.A. 4064) have been fully paid; or (4) proof satisfactory to the agent that the vehicle was not brought into the United States from outside the country. [Emphasis added.]
 
 
 [10]
 Section 40-2-25.1 provides that:
 (a) No application shall be accepted and no certificate of registration shall be issued to any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the 'Clean Air Act,' ... and as required by ... the 'National Traffic and Motor Safety Act,' ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards and unless all documents required by the Department of Revenue for processing an application for a certificate of registration or title are printed and filled out in the English language or are accompanied by an English translation.
 O.C.G.A. Sec. 40-2-25.1(a) (1985).
 
 
 [11]
 Section 40-3-29.1 states that:
 [N]o application shall be accepted and no certificate of title shall be issued to any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the 'Clean Air Act' ... and as required by the 'National Traffic and Motor Safety Act,' ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards and unless all documents required by the Department of Revenue for processing an application for a certificate of registration or title are printed and filled out in the English language or are accompanied by an English translation.
 O.C.G.A. Sec. 40-3-29.1 (1985).
 
 
 [12]
 Section 16-9-110 provides that:
 (a) It shall be unlawful for any person, firm, or corporation knowingly to sell, transfer, or otherwise convey any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the 'Clean Air Act,' ... and the 'National Traffic and Motor Safety Act,' ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards.
 O.C.G.A. Sec. 16-9-110(a) (Supp.1985).
 
 
 [13]
 The commerce clause of the United States Constitution reads in part as follows: "The Congress shall have the power to regulate commerce with foreign nations, and among the several states...." U.S.Const. art. I, Sec. 8, cl. 3. To determine whether Fla.Stat. Sec. 320.02(9) is violative of the commerce clause, we would be called upon to (1) determine exactly what interest the Florida statute purports to protect, (2) determine whether the statute burdens commerce, and if so, to what extent, and (3) balance the weight and nature of the interests protected by the statute against the extent to which it imposes a burden on commerce. See generally Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981). Nothing would be gained by applying the balancing tests required for commerce clause review on an unconstitutional statute
 
 
 [14]
 The parties did not present these issues to the district court. The panel could have immediately remanded the case to the district court directing it to consider these issues after presentations by the parties. The panel required supplemental briefs and ruled on the issues without remand
 
 
 [15]
 Before the panel and this in banc court, the parties agreed that the case is not moot. Because the panel raised the issue, we discuss it
 
 
 [16]
 The State of Florida's Attorney General has represented the state's interest in the lawsuit throughout the litigation. Consequently, the lack of a state official's name in the style of the case has not prejudiced the state officials. We also note that the district court has granted injunctive relief
 All other pending motions are denied.
 
 
 [17]
 Judge Clark did not participate in the decision of this case
 
 
 [1]
 28 U.S.C. Sec. 1331 (1982) provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Because Sims and all of the members of FICA are citizens of the State of Florida, appellees could not invoke the district court's diversity of citizenship subject matter jurisdiction. See 28 U.S.C. Sec. 1332 (1982)
 
 
 [2]
 For convenience, I hereinafter use "title" to refer to the relief Sims seeks, namely the issuance of title to and registration for her gray market automobile
 
 
 [3]
 In addition to an order compelling the Department to title her gray market automobile, Sims also asks the court, in a common prayer for relief with FICA, to enjoin the future enforcement of Fla.Stat. Sec. 320.02(9). Sims, however, does not allege that she intends to import another gray market automobile and that she therefore needs such relief. Because prospective relief is not necessary to make Sims' whole, and since equity does not grant that which is not needed, we should not read the complaint as including a prayer by Sims that the State be enjoined from enforcing Sec. 320.02(9)
 
 
 [4]
 For simplicity, I refer to FICA's members collectively as importers, import brokers, and mechanics. See infra note 15 for the description of FICA's members contained in the complaint. In the text, I divide them into two groups: the first consisting of the importers, the second consisting of import brokers and mechanics
 
 
 [5]
 If one considers how Sims would have proceeded had she filed suit in state court, the state law basis of Sims' claim becomes obvious. Sims would have petitioned the state circuit court (Florida's trial court of general jurisdiction) to issue a writ of mandamus compelling the director of the Department to title her automobile. The director, in his answer to Sims' petition, would have alleged that Sims was not entitled to relief because she had not complied with Fla.Stat. Sec. 320.02(9). Sims, in turn, would have moved the court to strike that defense as insufficient on the ground that it was barred by federal law
 
 
 [6]
 The majority does not address this question--whether Sims' and FICA's claims are based on federal or state law. By ignoring it, the majority disregards its continuing duty to ensure that the district court had subject matter jurisdiction to entertain the case
 
 
 [7]
 At the time Sims filed suit, NHTSA had a backlog of 14,000 compliance applications awaiting approval. Because of this backlog, an owner could expect to wait up to nine months for NHTSA to issue a bond release letter
 
 
 [8]
 The Supreme Court has made it plain that counsel have an affirmative obligation to call the court's attention to facts which suggest mootness. See Board of License Comm'rs v. Pastore, 469 U.S. 238, 240, 105 S.Ct. 685, 686, 83 L.Ed.2d 618 (1985)
 
 
 [9]
 The district court's dispositive opinion plainly relied on Sims' counsel's representation that NHTSA had not yet issued the bond release letter: "Sims still has not received a bond release letter from NHTSA, and it is not likely that she will receive one in the near future because in July 1985, NHTSA had 14,000 forms to review. The seed of Sims' complaint lies in this bureaucratic traffic jam."
 
 
 [10]
 Counsel of course recognized that the panel had a duty to satisfy itself that the controversy before it was still live. See C & C Prods., Inc. v. Messick, 700 F.2d 635, 636 (11th Cir.1983) ("The case must be viable at all stages of the litigation; it is not sufficient that the controversy was live only at its inception."). Once an appellate court determines that the controversy has ended, it must remand the matter to the trial court with directions that the judgment be vacated and the matter dismissed, see United States v. Munsingwear, Inc., 340 U.S. 36, 39-40, 71 S.Ct. 104, 106-07, 95 L.Ed. 36 (1950), even when, as the majority notes, ante at 1459 n. 15, the parties desire a decision on the merits and "agree" that the case is not moot. See DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974)
 
 
 [11]
 The "mere possibility" that Sims would bring another gray market automobile into Florida would not have been enough to satisfy the "capable of repetition" requirement and thereby create an article III controversy for the district court to decide. See Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183-84, 71 L.Ed.2d 353 (1982); Morgan v. Roberts, 702 F.2d 945, 947 (11th Cir.1983)
 
 
 [12]
 Sims suggests in her brief to this court on rehearing en banc that her controversy with the State might recur when she seeks to re-register her automobile each year as required by Fla.Stat. Sec. 320.055 (1987). This suggestion is baseless for two reasons. First, a controversy over re-registration would not be a recurrence of the controversy described in Sims' complaint. Second, assuming that it would be, there is no reason to believe that any such controversy will arise because we know that Sims possesses the documents required for annual re-registration under Fla.Stat. Sec. 320.055, which are the same as those required for initial registration under Fla.Stat. 320.02(9)
 
 
 [13]
 The standing and mootness inquiries are closely related. See Warth v. Seldin, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343. The standing inquiry asks whether the plaintiff--as opposed to someone else--is entitled to relief, while mootness focuses on "whether the occasion for judicial intervention persists." Id. One commentator has defined mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973), cited in United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980)
 
 
 [14]
 To have standing in its own right FICA would have to allege injury to itself, as an association, rather than to its members. See Center for Auto Safety v. National Highway Traffic Safety Admin., 793 F.2d 1322, 1328-29 n. 41 (D.C.Cir.1986)
 
 
 [15]
 In the complaint, FICA alleged that it is comprised of
 persons and Florida business entities who support improving opportunities for commerce with foreign nations in the importation, use and sale in the United States of foreign-manufactured automobiles that are converted in this country to comply with emission and safety standards of the Clean Air Act and the Vehicle Safety Act. Plaintiff FICA's members include importers of automobiles for their personal use as well as importers for sale, or dealers; brokers of import transactions; owners and operators of automotive conversion and compliance facilities, equipped to comply with safety standards established pursuant to the Vehicle Safety Act; and owners and operators of specialized automotive testing laboratories, equipped to comply or verify compliance with emission standards established pursuant to the Clean Air Act.
 The record discloses almost nothing else about FICA. The only other reference to FICA is contained in the testimony of Gary Sims, appellee Sims' husband, who is the secretary of FICA. Gary Sims testified that FICA "is a group of individuals that either import automobiles as dealers, they convert them as conversion people, they sell the automobile parts to the people who convert them, they,--they own the testing facilities, they are individuals who import cars for their personal use."
 
 
 [16]
 In addition, FICA must show that "the interests it seeks to protect are germane to the [association's] purpose [and that] neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit." Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); see also Pennell v. City of San Jose, --- U.S. ----, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988); International Union, United Auto., Aero. & Agric. Implement Workers of America v. Brock, 477 U.S. 274, 281-82, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986)
 
 
 [17]
 The Supreme Court in Warth stated:
 For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.
 422 U.S. 490, 501-02, 95 S.Ct. 2197, 2206-07 (citations omitted). In order to determine the standing question, I not only take the allegations in the complaint as true, but I also deem FICA's complaint as amended to conform to any evidence relevant to standing introduced at trial. See Fed.R.Civ.P. 15(b).
 
 
 [18]
 At trial, FICA presented no further evidence concerning the standing of this group of members; hence, we must decide the standing of this group, and thus of FICA, on the basis of the factual allegations quoted in the text
 
 
 [19]
 The holdings of Warth and Anderson are squarely on point and would seem to control our decision. Inexplicably, the majority ignores these holdings. It cites Warth solely for the elementary principle that in ruling on a motion to dismiss for lack of standing, a court must accept the plaintiff's allegations of fact as true, and it fails even to acknowledge Anderson 's existence. What are the district judges of our circuit to do the next time a defendant challenges the plaintiff's standing under Warth and Anderson, and the plaintiff, in response, cites today's holding?
 
 
 [20]
 The limitation is subject to exception where there is (1) a close relationship between the third party and the party whose rights are asserted, and (2) the existence of obstacles preventing the latter from asserting its rights on behalf of itself, see Singleton v. Wulff, 428 U.S. 106, 113-16, 96 S.Ct. 2868, 2874-75, 49 L.Ed.2d 826 (1976), but these conditions are not present in this case
 
 
 [21]
 The eleventh amendment provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 U.S. Const. amend. XI. As it has been interpreted, the eleventh amendment proscription applies to suits brought by a citizen against his own state or an agency of the state. See Hans v. Louisiana, 134 U.S. 1, 10, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890); see also Welch v. State Dep't of Highways & Public Transp., 483 U.S. 468, 107 S.Ct. 2941, 2945-46, 2949-53, 97 L.Ed.2d 389 (1987).
 
 
 [22]
 The complaint named the Attorney General of Florida, Jim Smith, as a defendant solely because Fla.Stat. Sec. 86.091 (1987) requires the plaintiff in a suit in state court that challenges the constitutionality of a Florida statute to notify the Attorney General of the suit by serving him a copy of the complaint. This statute does not apply to suits in federal court. Accordingly, since Sims and FICA sought no relief against the attorney general, they moved the district court to dismiss him from the case. The State, having no reason to oppose the motion, agreed to the dismissal, and on August 29, 1985 the district court entered an order dropping the attorney general as a party defendant
 
 
 [23]
 The majority seems to recognize this point reluctantly. The majority notes that the State did not present the sovereign immunity defense until the panel that initially considered this appeal raised the issue, and appears to criticize the panel for doing so with the following statement: " '[w]e have never held that [the eleventh amendment defense] is jurisdictional in the sense that it must be raised and decided by this court on its own motion.' Patsy v. Board of Regents of the State of Florida, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19 [73 L.Ed.2d 172] (1982)." See ante at 1460
 Although the State did not plead the sovereign immunity defense in the district court, the "defense sufficiently partakes of the nature of a jurisdictional bar so that it need not [have been] raised in the trial court." Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974). Patsy does not prohibit an appellate court from sua sponte raising the issue of sovereign immunity, as the majority implies. The Supreme Court in Patsy merely noted that, because the parties before it had not briefed the eleventh amendment issue and because the possibility existed that the state had statutorily waived the defense as to the particular circumstances of the suit, the Court deemed it inappropriate for it, rather than the district court, to decide the issue. Patsy, 457 U.S. at 515 n. 19, 102 S.Ct. at 2567 n. 19. The Court therefore reversed the district court's dismissal, which was based on an erroneous view that exhaustion of state remedies is required in section 1983 cases, and suggested that the district court address the eleventh amendment question on remand. Id. In contrast to Patsy, both parties to this action have fully briefed the eleventh amendment issue, and at oral argument before the en banc court the State vigorously pressed for dismissal on eleventh amendment grounds. Also in contrast to Patsy, there is no possibility that the State has waived sovereign immunity in this case. The Florida constitution requires "specific, clear, and unambiguous language in a statute to constitute a waiver of sovereign immunity." Manatee County v. Town of Longboat Key, 365 So.2d 143, 147 (Fla.1978). Sims and FICA have not argued, nor has this court uncovered, the existence of such a legislative enactment. Accordingly, the panel's action in raising the eleventh amendment issue was not "unwarranted."
 
 
 [24]
 This court could defer ruling on the jurisdictional issues that I have discussed and, as an alternative disposition, direct that on receipt of our mandate the district court grant the plaintiffs leave to amend their complaint--by dropping the State and the Department from the suit, substituting for them the director of the Department as party defendant, and making new allegations of fact demonstrating the director's liability to the plaintiffs--and, then, that process be served upon the new defendant. The majority tacitly rejects this alternative because such a disposition would, obviously, prevent it from deciding the constitutionality of Fla.Stat. Sec. 320.02(9). Moreover, the majority knows that if this case were remanded to the district court--with instructions that that court grant the plaintiffs leave to amend, as described above--the merits may not be reached. After granting the plaintiffs leave to amend, the district court might dismiss the case for lack of subject matter jurisdiction or a justiciable controversy because Sims' claim is moot and FICA lacks standing to sue
 
 
 [25]
 After the three-judge panel assigned to this case raised the eleventh amendment issue at oral argument, Sims and FICA filed a motion to add Charles Brantley, the director of the Department, as a party defendant. The panel denied the motion on May 26, 1987, and Sims and FICA have not renewed it. The court therefore acts sua sponte in substituting Brantley as the party defendant at this time
 
 
 [26]
 In the majority's words, its action in substituting the director as the party defendant and binding him to the district court's injunction cannot be considered as unfair because of "the state's initial waiver of the defense, the state's reluctance to urge the issue before the in banc court, and the lack of prejudice to the state and its officials...." See ante at 1460
 
 
 [27]
 The en banc court's decision binding the director, in his official capacity, to the injunction issued against the State and the Department is tantamount to the issuance of an injunction against him