MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2022 ME 58
Docket:         BCD-21-257
Argued:         May 10, 2022
Decided:        November 29, 2022

Panel:          STANFILL, C.J., JABAR and HORTON, JJ., CLIFFORD, A.R.J. and HUMPHREY, A.R.J.[*]

RUSSELL BLACK et al.

v.

BUREAU OF PARKS AND LANDS et al.

PER CURIAM

[¶1]  NECEC Transmission LLC, Central Maine Power Co. (collectively, CMP[1]), and the Bureau of Parks and Lands appeal from a judgment of the Business and Consumer Docket (*Murphy, J.*) entered in favor of the plaintiffs[2] (collectively Black), vacating the Bureau's lease of public reserved land to CMP for construction of a high-capacity transmission line.  Black cross-appeals from

---

[*] Justice Humphrey sat at oral argument and participated in the initial conference while he was an Associate Justice and, as directed and assigned by the Chief Justice, is now participating in this appeal as an Active Retired Justice.

[1] As did the trial court, we refer to defendant-appellants Central Maine Power Co. and NECEC Transmission LLC collectively as "CMP" for the sake of consistency with prior orders in this case.

[2] The plaintiff-appellees are Senator Russell Black, Senator Richard A. Bennett, former Senator Thomas B. Saviello, former Representative Kent Ackley, former Representative Seth Berry, Representative Chad Grignon, former Representative Denise Harlow, Representative Margaret O'Neil, Representative William Pluecker, Edwin Buzzell, Greg Caruso, Charlene Cummings, Robert Haynes o/b/o Old Canada Road National Scenic Byway, Cathy Johnson, Ron Joseph, John R. Nicholas Jr., George A. Smith, Clifford Stevens, Todd Towle, and the Natural Resources Council of Maine (NRCM).

the trial court's decision not to address the substantive question of whether the Bureau had the constitutional authority to lease the public reserved land. Black later moved to dismiss all appeals on the ground that a citizen's initiative, which purported to retroactively require approval of leases like the ones at issue here by a vote of two-thirds of all members elected to each House of the Legislature, rendered the appeals moot.

[¶2] The broad questions we answer are, in order, (1) whether the United States Constitution permits a citizens' initiative to retroactively invalidate the lease at issue; (2) what procedure, if any, the public-lands provision of the Maine Constitution and its implementing statutes required the Bureau to follow before leasing the public reserved lands; and (3) whether the Bureau's lease of the public reserved lands exceeded the Bureau's constitutional or statutory leasing authority.

[¶3] We determine that this case is justiciable, vacate the judgment rendered for Black, and remand for entry of judgment in favor of the Bureau and CMP.

## I. BACKGROUND

## A.    Constitutional and Statutory Background

[¶4]  Public reserved lands existed before Maine was a state.  "At the close of the Revolutionary War, the Commonwealth of Massachusetts owned . . . vast amounts of land, including most of what is now the state of Maine."  Lee M. Schepps, *Maine's Public Lots: The Emergence of a Public Trust*, 26 Me. L. Rev. 217, 219 (1974).  When Maine became a state in 1820, it came to own that land through the agreement that granted it independence—the Articles of Separation.  *Id.* at 220-21.

[¶5]  Beginning in the 1970s, public concern about the sale of public lands to private persons or entities precipitated efforts to preserve public lands for future generations.  The culmination of these efforts was a 1993 amendment to the Maine Constitution:

> State park land, public lots or other real estate held by the State for conservation or recreation purposes and designated by legislation implementing this section may not be reduced or its uses substantially altered except on the vote of 2/3 of all the members elected to each House.  The proceeds from the sale of such land must be used to purchase additional real estate in the same county for the same purposes.

Me. Const. art. IX, § 23.  During the several years following the amendment's ratification, the Legislature enacted implementing legislation.  *See, e.g.,*

4

12 M.R.S. §§ 598 to 598-B (2022) (Designated Lands); 12 M.R.S. §§ 1801-1900 (2022) (establishing the Bureau of Parks and Lands and prescribing its authority).

[¶6]  The Designated Lands statutes apply the requirements of article IX, section 23 to certain types of public lands held by the Department of Inland Fisheries and Wildlife; under the care, custody, control, and management of the Bureau; managed by the Baxter State Park Authority; and gifted to the state or acquired by referendum.  *Id.* § 598-A(1), (2-A), (4)-(6).  It applies to public reserved lands and prevents those lands from being reduced or substantially altered without two-thirds legislative approval.  *Id.* §§ 598-A, 598-A(2-A)(D), 1801(8) (defining "public reserved lands").  "'Reduced' means a reduction in the acreage of an individual parcel."  *Id.* § 598(4).  "'Substantially altered,' in the use of designated lands, means changed so as to significantly alter physical characteristics in a way that frustrates the essential purposes for which that land is held by the State."  *Id.* § 598(5).  "The essential purposes of public reserved and nonreserved lands are the protection, management and improvement of these properties for the multiple use objectives established in section 1847."  *Id.*

[¶7] In turn, section 1847 declares that it is in the public interest "that the public reserved lands be managed under the principles of multiple use to produce a sustained yield of products and services by the use of prudent business practices and the principles of sound planning and that the public reserved lands be managed to demonstrate exemplary land management practices, including silviculture, wildlife and recreation management practices." *Id.* § 1847(1). The statutory definition of "multiple use" includes "[t]he harmonious and coordinated management of the various resources without impairing the productivity of the land and with consideration being given to the relative values of the various resources." *Id.* § 1845(1)(D). And "'[s]ustained yield' means the achievement and maintenance in perpetuity of a high-level regular periodic output of the various renewable resources of the public reserved lands without impairing the productivity of the land." *Id.* § 1845(2). The Bureau effectuates these principles through the creation of comprehensive management plans and specific action plans. *Id.* § 1847(2).

[¶8] "[C]onsistent with the management plans," and the above statutory provisions, the Bureau, through its director, is authorized to "take actions on the public reserved lands." *Id.* § 1847(3). For example, the Bureau is authorized to sell resources on public reserved lands, including timber, grass, wild foods,

6

and sand and gravel for use in the construction of public roads, *id.* § 1848(1), and to lease public reserved land for both private and industrial uses, such as campsites, mills, or dams, *id.* § 1852(5), (6).  Relevant here, until 2021 the Bureau was authorized to lease the right to "[s]et and maintain or use poles, electric power transmission and telecommunication transmission facilities, roads, bridges and landing strips" on public reserved lands.  12 M.R.S. § 1852(4)(A) (2021).[3]

## B.    Project Background and Procedural History

[¶9]  In December 2014, the Bureau leased part of the Johnson Mountain and West Forks Plantation[4] public reserved lands to CMP, to accommodate a small portion of a high-capacity electric transmission line known as the New England Clean Energy Connect (the Project).  The proposed Project is 145.3 miles long, with 0.9 miles of the line crossing the leased portion of the Johnson

---

[3]   The law as later amended by the citizens' initiative expands the language to include "transmission *lines and* facilities" and provides that "[a]ny such . . . transmission lines . . . are deemed to substantially alter the uses of the land[,] . . . and a lease or conveyance for the purposes of constructing and operating such . . . transmission lines . . . may not be granted without first obtaining the vote of 2/3 of all the members elected to each House of the Legislature."  12 M.R.S. § 1852(4)(A)(2022); *see* I.B. 2021, ch. 1, § 1 (effective Dec. 19, 2021) (emphasis added).

[4]   The West Forks Plantation public reserved lands are comprised of four individual lots in the Upper Kennebec Region: the Northeast, Northwest, Central, and Southwest lots.  The West Forks Plantation Northeast lot adjoins with the Johnson Mountain public reserved lands, and is the lot described by the parties simply as the "West Forks Plantation" public reserved lands.  For consistency, we will follow suit.

Mountain and West Forks Plantation public reserved lands. The area encompassed by the lease amounts to 2.6% of the combined 1,241 acres of the Johnson Mountain and West Forks Plantation public reserved lands.

[¶10] In 2020, CMP and the Bureau realized that the 2014 lease violated a Maine statute because the Bureau had leased the public reserved land before the Maine Public Utilities Commission had granted a Certificate of Public Convenience and Necessity (CPCN) authorizing CMP to proceed with the Project. *See* 35-A M.R.S. § 3132(13) (2022) (barring any lease of public land for the purpose of constructing a transmission line unless a CPCN has been issued). The CPCN was not obtained until 2019. On June 23, 2020, the Bureau and CMP executed a new lease for the same public lands but with an increase in the base annual payment paid by CMP.[5] Other alterations included a change in the lease title from "Transmission Line Lease" to "Amended and Restated Transmission Line Lease" and the addition of a reference to the 2019 CPCN. Because the 2020 lease explicitly states that it supersedes the 2014 lease and that the 2014

---

[5] Pursuant to the 2014 lease, CMP was to make annual payments, with the first payment due on the date of execution of the lease, "adjusted each year in accordance with the increase in the Consumer Price Index." A 2015 lease amendment increased the base annual payment from $1,400 to $3,680, and the 2020 lease further increased the base annual payment to $65,000.

8

lease is terminated and of no further effect, our focus on review is on the 2020 lease.

[¶11]  On the same day that the 2020 lease was executed, Black filed a three-count complaint in Superior Court challenging the 2014 lease as ultra vires because the lease would reduce or substantially alter public reserved lands and therefore had to be approved by a two-thirds vote of the Legislature. Black filed an amended complaint—the operative pleading—on July 17, 2020. The amended complaint sought (1) a declaration that the 2020 lease was also ultra vires; (2) an injunction to prevent construction of the Project; and (3) alternatively, judicial review of the Bureau's leasing decision, *see* M.R. Civ. P. 80C.  The case was transferred to the Business and Consumer Docket (*Murphy, J.*) on August 25, 2020.

[¶12]  The Bureau and CMP each moved to dismiss the counts for declaratory judgment and injunctive relief, arguing that they were duplicative of the Rule 80C count; and CMP's motion also requested that the count for judicial review pursuant to M.R. Civ. P. 80C be dismissed for plaintiffs' lack of standing.  While those motions were pending, the trial court ordered the Bureau to file the administrative record, which it did.  The record contained a memorandum dated September 24, 2020 (Findings Memo), included "to

facilitate judicial review," that purportedly memorializes the Bureau's determination that the 2020 lease would not reduce or substantially alter the uses of the Johnson Mountain and West Forks Plantation public reserved lands.[6]

[¶13]  In orders issued on October 30 and December 21, 2020, the trial court denied CMP's motion to dismiss the 80C appeal for lack of standing and the Bureau's and CMP's motions to dismiss the counts for declaratory judgment and injunctive relief.  In response to an argument made by the Bureau that, if successful, would have been potentially dispositive of the case, the trial court then issued an order, on March 17, 2021, holding that utility leases granted by

---

[6]  An introductory paragraph of the Findings Memo states that the "memorandum provides background detail and context and memorializes actions, considerations, and legal interpretations by [the Bureau] related to the [Project] utility corridor lease . . . .  The lease was originally signed in December 2014 (2014 Lease) and was amended and restated in June 2020 (2020 Amended and Restated Lease).  In preparing this memorandum, the Bureau consulted with former Bureau Director Willard Harris and former Director of Operations Tom Morrison for additional detail and context regarding the Bureau's memorialized actions, considerations, and legal interpretations with respect to the 2014 Lease and review process."  According to the memorandum, the Johnson Mountain and West Forks Plantation public reserved lands have limited ecological or recreational value.  Their dominant use is timber management.  The timber on the lots was harvested in 1986-1987 and 2006-2007, with the next harvest scheduled to occur in 2026-2027.  The abutting properties were also historically managed as commercial timberlands.  An existing transmission line corridor for the so-called Jackman Tie Line straddles the border between the two lots and is three miles long and 100 feet wide.  The memorandum states that, although the Bureau did not reduce the determination to writing, the Bureau, before granting each lease, first determined that the Project does not substantially alter the Johnson Mountain and West Forks Plantation public reserved lands because the primary use of the property is timber harvesting (and the leases require that the Bureau be paid the value of the trees cut for the corridor) and because the presence of the Jackman Tie Line indicates that these lots are a reasonable place for another transmission corridor.

the Bureau "are not categorically exempt from application of Article IX, Section 23 of the Maine Constitution."

[¶14] The trial court next addressed, in an order entered April 21, 2021, the parties' motions regarding the factual record. The trial court struck from the record the Findings Memo proffered by the Bureau. Finding that nothing in the record demonstrated that the determinations in the Findings Memo were made contemporaneously with the execution of the leases, the trial court concluded that it was barred from considering any post hoc material (i.e., any determination made by the Bureau after the execution of the lease). The trial court also denied the Bureau's alternative motion to remand the matter so that it could make factual findings anew after accepting public comments, including from the plaintiffs here. From this order the Bureau and CMP appealed. This Court (*Gorman, J.*) dismissed that appeal as interlocutory in a June 8, 2021, order.

[¶15] After the parties filed motions for judgment on the declaratory judgment count and briefs on the Rule 80C issues, the trial court issued a final judgment on August 10, 2021. It granted Black a declaratory judgment, held that Black had waived the request for injunctive relief, and reversed the Bureau's decision to lease the public reserved land. As to the declaratory

judgment, the trial court held that the Bureau must make a determination of whether the leases would result in a reduction or substantial alteration to the public reserved lands by applying the statutory definitions of those terms when deciding whether to lease the lands.[7]  The trial court then held that "the Maine Constitution requires that any such determination must be made pursuant to a public administrative process" and indicated that the Bureau needed to follow the process required for an adjudicatory proceeding.  *Cf.* 5 M.R.S. § 9051-A (2022) (providing notice requirements for environmental agency adjudicatory hearings).

[¶16]  Addressing the Rule 80C claim next, the trial court found "no competent evidence supporting [the Bureau's] assertion that it made the requisite public, pre-execution findings that the 2020 lease would not reduce or substantially alter the uses of the lands."  It declined the Bureau's request to remand without vacating the lease, in part because it could not, "as a matter of separation of powers," create an administrative process for the Bureau.

---

[7]  In so holding, the trial court rejected the Bureau's argument that management plans prepared pursuant to 12 M.R.S. § 1847(2) (2022) suffice for a determination regarding substantial alteration. These plans require the Bureau director to, among other things, "compile and maintain an adequate inventory of the public reserved lands, including not only the timber on those lands but also the other multiple use values for which the public reserved lands are managed." *Id.*

12

[¶17]  The Bureau and CMP timely appealed three days later, and Black cross-appealed.  *See* M.R. App. P. 2A, 2B(c)(1), 2C(a)(1)-(2).  On August 24, 2021, Black moved to lift the automatic stay pending the appeal.  *See* M.R. Civ. P. 62(g); M.R. App. P. 10.  After agreement of all the parties at a conference, this Court (*Jabar, J.*) ordered CMP "to refrain from all construction activities, including vegetation removal" on the leased lands pursuant to M.R. Civ. P. 62(g).

[¶18]  On November 2, 2021, the people of Maine voted to approve an initiated bill (the Initiative) that changed the law governing the permitting of electric transmission lines and restricting where they can be constructed.[8]  I.B. 2021, ch. 1, §§ 1-6 (effective Dec. 19, 2021).[9]  The legislation enacted by the Initiative requires that all "high-impact electric transmission lines" receive legislative approval in addition to a CPCN and bans outright such lines from "the

---

[8]  On November 2, 2021, fifty-nine percent of Maine voters approved the Initiative, which took effect on December 19, 2021, and effectively halted the Project.  I.B. 2021, ch. 1, §§ 1-6; *see NECEC Transmission LLC v. Bureau of Parks and Lands*, 2022 ME 48, ¶¶ 18-23, 281 A.3d 618.  The effective date of the Initiative was approximately four months after the trial court issued its final judgment.  The trial court, therefore, analyzed the relevant law as it existed before the Initiative took effect.  *See* 12 M.R.S. § 1852(4) (2021).

[9]  Bills introduced through the initiative process are assigned I.B. ("Initiated Bill") designations.  *See* Maine State Legislature, *Votes on Initiated Bills*, https://legislature.maine.gov/lawlibrary/votes-on-initiated-bills-1910/9204/ (last visited Aug. 30, 2022).  An initiative is a type of referendum that allows voters to propose to the Legislature any bill, resolve, or resolution.  Me. Const. art. IV, pt. 3, § 18.  The Secretary of State must verify the validity of the requisite number of signatures on the petition.  *See id.* § 18(2); 21-A M.R.S. § 905(1) (2022).  The Legislature may then pass that law as submitted or refer the initiated measure to the people for a referendum vote.  Me. Const. art. IV, pt. 3, § 18(2)-(3).

Upper Kennebec Region," both retroactively to September 16, 2020. *Id.* §§ 2-6.

Relevant here, the Initiative also amends the statutes authorizing the Bureau to

lease public reserved land for construction of transmission lines by requiring

that such leases first receive two-thirds legislative approval. *Id.* § 1. That

provision applies retroactively to September 16, 2014, and therefore would

govern the 2014 lease as well as the 2020 lease. *Id.* On December 23, 2021,

Black moved to dismiss all pending appeals as moot in light of the Initiative.

After the Bureau moved to enlarge the time to respond to Black's motion, this

Court (*Horton, J.*), ordered that the motion to dismiss would be considered with

the merits of the appeal, and the Bureau and CMP filed oppositions to the

motion shortly thereafter. *See* M.R. App. P. 4(d), 10.

## II. DISCUSSION

[¶19] Before turning to the merits of the appeal, we address the

threshold issues of jurisdiction and standing, and also the issue of the

retroactive application of section 1 of the Initiative to both the 2020 lease and

its 2014 predecessor. We determine that the Superior Court had jurisdiction

pursuant to the Maine Administrative Procedure Act and Rule 80C of the Maine

Rules of Civil Procedure, that certain plaintiffs have standing to bring the claims

presented, and that section 1 of the Initiative cannot constitutionally apply to the 2020 lease or its 2014 predecessor.

[¶20]  We then address Black's contention that article IX, section 23 of the Maine Constitution and the Designated Lands statutes required the Bureau to make a formal determination, before granting the 2014 lease and the 2020 lease, that neither lease would reduce or substantially alter public lands.  We conclude that the Bureau's grant of leases of public reserved lands were not adjudicatory acts because the Legislature had granted the Bureau broad authority to grant leases that did not reduce or substantially alter public reserved lands, without requiring any formal findings, notice, hearing, or other administrative or adjudicative process.  Therefore, we conclude that, by the very act of granting the leases, the Bureau determined that the leases were within its constitutional and statutory authority.

[¶21]  We further conclude that, because the Bureau's lease of public reserved land is a contractual act limited only by the Legislature's broad grant of leasing authority to the Bureau, the grant of the 2020 lease is reviewable only to determine whether the Bureau exceeded its statutory or constitutional authority and therefore acted ultra vires.  Lastly, based on the undisputed facts regarding the nature, location, uses, and extent of the 2020 lease and the public

reserved lands it concerns, we conclude that the 2020 lease does not cause the public reserved lands, of which it concerns a very small portion, to be "substantially altered" for purposes of the Maine Constitution and the Designated Lands statutes. Me. Const. art. IX, § 23; 12 M.R.S. § 598(5). Because the 2020 lease concerns the same portion of the same public reserved lands as the 2014 lease, our conclusion necessarily applies to both.

## A.    Jurisdiction

[¶22]  The parties disagree about the basis of jurisdiction both in the trial court and here.  The Bureau and CMP maintained, in their motions to dismiss Black's ultra vires claim in Count 1 and the injunction claim in Count 2 of the first amended complaint, that jurisdiction exists solely under Rule 80C, and they repeat the argument here, citing to our decision in *Fair Elections Portland v. City of Portland,* 2021 ME 32, ¶¶ 19, 21 n.7, 252 A.3d 504—precedent in which we approved the dismissal of independent claims as duplicative of a Rule 80B appeal.  Black responds that the purpose of Count 1 was to seek "a declaratory judgment that signing the 2014 and 2020 leases without first obtaining a two-thirds vote of each House violated Article IX, Section 23 and was therefore *ultra vires*."  Neither argument is wrong, and our decision in *Sold, Inc. v. Town of Gorham* helps explain why.  2005 ME 24, 868 A.2d 172.

[¶23]   In *Sold*, seven subdivision developers brought a declaratory judgment action—not a Rule 80B appeal—challenging certain impact fee requirements in the conditional approvals the town planning board had granted.  *Id.* ¶¶ 1, 3.  We held that their appeal was barred by the exclusivity provisions of Rule 80B because the actions appealed from were not outside the planning board's authority and could not be the basis for an ultra vires claim:

> All of the subdivisions at issue in this action were approved, subject to a condition requiring payment of the impact fee.  There is no dispute that none of the conditional approvals given to the plaintiffs' subdivision applications were challenged within the thirty-day period required by M.R. Civ. P. 80B(b).  When the time to file an appeal expired, the conditional approvals, including the impact fee requirements, became final, and were not subject to challenge.
>
> A declaratory judgment action cannot be used to create a cause of action that does not otherwise exist.  A declaratory judgment action may only be brought to resolve a justiciable controversy.  Thus, a declaratory judgment action cannot be used to revive a cause of action that is otherwise barred by the passage of time.  The declaratory judgment law, 14 M.R.S.A. §§ 5951-5963 (2003), does not provide a self-help device for parties who have failed to timely appeal a municipal administrative decision to gain an extension or revival of the time to appeal and reopen a decision that has otherwise become final.
>
> The plaintiffs assert that they may appeal by a declaratory judgment action, after the normal time period for appeal has expired, if the challenged action of the municipality is ultra vires as being beyond the lawful statutory or constitutional authority of the Town to act.  If the plaintiffs' view of the law is correct, then there would be, in effect, no time limit to appeal any action of a municipal

government—or the state government for that matter—that is alleged to be inconsistent with a statutory or constitutional requirement. Our law does not countenance such a wholesale deviation from explicit provisions requiring timely appeals to promote finality of administrative actions.

Subject to equitable defenses including laches, a governmental action may be challenged at any time, as ultra vires, when the action itself is beyond the jurisdiction or authority of the administrative body to act. Thus, municipal or state actions may be collaterally attacked as outside the jurisdiction or authority of an agency, when it is claimed that the ordinance or statute under which the administrative agency purported to act was unconstitutional on its face, thus rendering the administrative action beyond the lawful authority of the challenged agency.

Here, there is no dispute that the Planning Board had authority to consider, approve, and attach conditions to approvals of subdivisions. Plaintiffs only challenge one condition of the subdivision approval as inconsistent with statutory and constitutional requirements. Such challenges are the essence of matters that must be brought pursuant to Rule 80B to question whether the particular action of a municipal administrative agency is consistent with the requirements of law.

*Id.* ¶¶ 9-13 (citations omitted).

[¶24] Our decision in *Sold* illustrates the principle that ultra vires claims constitute a narrow exception to the Rule 80B (and Rule 80C) exclusivity rule, but only if Rule 80B (or Rule 80C) review is unavailable. Applied to this case, that principle leads us to conclude that Black's declaratory judgment count applies only to the 2014 lease and is duplicative as to the 2020 lease. His appeal of the 2020 lease met the Rule 80C time limits, and Rule 80C, along with the

Maine Administrative Procedure Act, authorizes a reviewing court to entertain claims that an agency decision is "[i]n excess of the statutory authority of the agency." 5 M.R.S. § 11007(4)(C)(2) (2022). That the 2014 lease was terminated by the 2020 lease raises a mootness issue as to Black's declaratory judgment count, but because the ultra vires issue is the same as to both leases, an invalidation of the 2020 lease on ultra vires grounds would likewise invalidate the 2014 lease, were it still in effect, rather than resurrecting it. Moreover, the trial court's ruling that the Bureau was required to make a "substantial alteration" determination and conduct an administrative process before granting the leases is reviewable here only under Rule 80C and the Maine Administrative Procedure Act because the ruling focused on the procedure for granting the leases, not on the Bureau's substantive authority to grant them. In sum, Rule 80C allows us to consider both of Black's challenges to the leases— the Bureau's failure to meet alleged procedural requirements and the Bureau's alleged ultra vires action—and we deem Black's Rule 80C appeal as to the 2020 lease to be the appropriate focus of our review.

## B.    Standard of Review

[¶25]  "When we consider a judgment of the Superior Court, reviewing a decision of a state administrative agency pursuant to M.R. Civ. P. 80C, we follow

the standards of review governing administrative appeals. Thus, when the trial court has acted in an intermediate appellate capacity, we review directly the original decision of the fact-finding agency, without deference to the ruling on the intermediate appeal by the court from which the appeal is taken." *Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 2, 985 A.2d 501. "Statutory construction is a question of law, and, therefore, we review [the agency's statutory interpretation] de novo." *Med. Mut. Ins. Co. of Me. v. Bureau of Ins.*, 2005 ME 12, ¶ 5, 866 A.2d 117.

## C.    Standing

[¶26]  We review standing de novo as a question of law and may raise the issue sua sponte; therefore we are not bound by the trial court's conclusion. *Blanchard v. Town of Bar Harbor*, 2019 ME 168, ¶ 8, 221 A.3d 554. The plaintiffs bear the burden of establishing standing, which is determined based on the circumstances that existed when the complaint was filed. *Bank of Am., N.A. v. Greenleaf*, 2014 ME 89, ¶ 7, 96 A.3d 700; *Conservation L. Found. v. Town of Lincolnville*, No. AP-00-3, 2001 Me. Super. LEXIS 26, at *21 (Feb. 28, 2001) (citing *Sims v. State of Florida*, 862 F.2d 1449, 1458 (11th Cir. 1989)).

[¶27]  In Maine, standing is prudential, not constitutional. *Roop v. City of Belfast*, 2007 ME 32, ¶ 7, 915 A.2d 966. Thus, this Court may "limit access to

the courts to those best suited to assert a particular claim." *Id.* (quotation marks omitted). "Just what particular interest or injury is required for standing purposes and the source of that requirement—whether statutory- or common law-based—varies based on the type of claims being alleged." *Greenleaf*, 2014 ME 89, ¶ 7, 96 A.3d 700. Our standing analysis in *Fitzgerald v. Baxter State Park Authority* is applicable because the plaintiffs in *Fitzgerald,* like those here, asserted that a state agency entrusted with management of public lands had acted in excess of its authority. 385 A.2d 189, 194, 196-97 (Me. 1978). In *Fitzgerald,* we decided that users of the public land in question had standing to challenge the agency's action. *Id.* at 196-97.

[¶28] CMP contends that none of the plaintiffs here "claim standing based on traditional property rights or a nexus to [the Bureau's leasing] decision," further noting that "most of these plaintiffs have not alleged *any* use of either the leased land itself or the broader public lots in Johnson Mountain Township or West Forks Plantation." To the contrary, at least three of the individual plaintiffs have sufficiently demonstrated standing. Specifically, the first amended complaint alleges that plaintiffs Edwin Buzzell, Clifford Stevens, and Todd Towle own and operate outdoor recreation and guiding businesses that "operate[] in and around the public reserved lands" subject to the lease,

and that they have hunted and fished in the area as well. Although these plaintiffs allege no specific harm beyond the transmission line's mere visibility, their history of use of the public reserved lands, occupied in part by the area encompassed in the original and subsequent leases, is sufficient to confer standing. *See id.* at 196-97.

[¶29] We further hold that NRCM has associational standing. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Conservation L. Found.*, 2001 Me. Super. LEXIS 26, at *18-19.

[¶30] NRCM satisfies each part of this test. First, Towle and Buzzell are members of NRCM and otherwise have standing to sue individually. Second, NRCM is an environmental advocacy group whose "mission is 'protecting, conserving, and restoring Maine's environment.'" The claims at issue seek the invalidation of a lease of public reserved lands and are undoubtedly germane to NRCM's environmental conservation mission.

[¶31] We have never determined whether individual members of the Legislature have standing to challenge agency action. *See Me. Senate v. Sec'y of State*, 2018 ME 52, ¶¶ 13, 25, 183 A.3d 749 (assuming without deciding that the Maine Senate had standing to seek "declaratory and injunctive relief to halt the implementation of ranked-choice voting"); *see also Carson v. Comm'r of the Dep't of Health & Hum. Servs.*, No. AP-18-48, 2019 Me. Super. LEXIS 170, at *3, 5-6 (June 27, 2019) (declining to determine whether a state senator had standing to bring a Rule 80C petition because other petitioners had standing). Because we have determined that other plaintiffs have standing to pursue these claims, we need not resolve this question here.

**D.    Retroactive Application of the Initiative to the 2020 Lease**

[¶32] After the Initiative went into effect, Black moved to dismiss this pending appeal on mootness grounds, contending that the enactment of the Initiative invalidated the 2020 lease as a matter of law and therefore obviated the need to review the trial court's judgment. We do not address the merits of moot cases absent exceptional circumstances, so before continuing our analysis we need to consider the effect of the Initiative upon the justiciability of this case. *See Mainers for Fair Bear Hunting v. Dep't of Inland Fisheries & Wildlife*, 2016 ME 57, ¶ 7, 136 A.3d 714. Black contends that application of the new law

(1) invalidates the lease between the Bureau and CMP; (2) creates the argued-for public process regarding substantial alteration determinations by requiring legislative approval of high-impact transmission line leases; and (3) eliminates the need for this Court to determine if the Project substantially alters the public reserved lands at issue because the legislation makes that determination by fiat. Whether section 1 of the Initiative moots this appeal, as Black contends, depends on whether the Initiative applies retroactively to the 2020 lease.

### 1. Retroactive Application Generally

[¶33] We begin our discussion of the Initiative by noting that "[t]he same constitutional limitations on legislative authority apply to citizen-initiated legislation as apply to the enactments of the Legislature," although "citizen-initiated legislation enjoys a heavy presumption of constitutionality and should be construed liberally." *NECEC Transmission LLC v. Bureau of Parks and Lands*, 2022 ME 48, ¶ 35, 281 A.3d 618 (quotation marks omitted). Section 1 of the Initiative amended 12 M.R.S. § 1852(4) to require two-thirds legislative approval before the Bureau may grant "a lease or conveyance for the

24

purpose of constructing and operating . . . transmission lines and facilities" and

makes the amendment retroactive to September 16, 2014.  I.B. 2021, ch. 1, § 1.[10]

[¶34]  A new statute enacted by citizen initiative or by the Legislature can

apply retroactively if (1) the statute is intended to apply retroactively and

(2) retroactive application does not violate any provisions of the Maine

Constitution.  *MacImage of Me., LLC v. Androscoggin County.*, 2012 ME 44, ¶¶ 21,

23, 40 A.3d 975; *State v. L.V.I. Grp.*, 1997 ME 25, ¶ 9, 690 A.2d 960 ("If the

Legislature intends a retroactive application, the statute must be so applied

unless the Legislature is prohibited from regulating conduct in the intended

---

[10]  Section 1 provides for the statute, as amended, to state in full:

> **4.  Lease of public reserved land for utilities and rights-of-way.**  The bureau may lease the right, for a term not exceeding 25 years, to:
>
> A.   Set and maintain or use poles, electric power transmission and telecommunication transmission lines and facilities, roads, bridges, and landing strips;
>
> B.  Lay and maintain or use pipelines and railroad tracks; and
>
> C.  Establish and maintain or use other rights-of-way.
>
> Any such poles, transmission lines and facilities, landing strips, pipelines and railroad tracks under this subsection are deemed to substantially alter the uses of the land within the meaning of the Constitution of Maine, Article IX, Section 23, and a lease or conveyance for the purpose of constructing and operating such poles, transmission lines, and facilities, landing strips, pipelines and railroad tracks under this subsection may not be granted without first obtaining the vote of 2/3 of all the members elected to each House of the Legislature.
>
> Notwithstanding Title 1, section 302 or any other provision of law to the contrary, this subsection applies retroactively to September 16, 2014.

12 M.R.S. § 1852(4) (2022); *see* I.B. 2021, ch. 1, § 1.

manner, and such a limitation upon the Legislature's power can only arise from the United States Constitution or the Maine Constitution." (quotation marks omitted)). *Cf. Opinion of the Justices*, 103 Me. 506, 508, 69 A. 627 (1907) ("[L]aws and regulations are to be held valid unless there can be pointed out some provision in the State or United States Constitution which clearly prohibits them.").

[¶35] The analysis of the first prong of the *MacImage* retroactivity test is plain: section 1 explicitly states that the law applies retroactively to September 16, 2014. I.B. 2021, ch. 1, § 1. The second prong requires a more extensive analysis. Black's motion to dismiss contends that retroactive application of section 1 of the Initiative to the 2020 lease does not violate the Contract Clause or the Due Process Clause of either the United States Constitution or the Maine Constitution. We disagree and hold that retroactive application of section 1 of the Initiative violates the Contract Clause of the United States Constitution,[11] and, therefore, need not reach Black's argument regarding the Due Process Clause's vested rights doctrine.

---

[11] CMP and the Bureau have raised no independent argument specific to the Maine Constitution's Contract Clause. We have never stated whether the Contract Clause of the Maine Constitution is coextensive with that of the U.S. Constitution. Because the issue is not briefed, this case is not the forum to decide that question. *See State v. Chan*, 2020 ME 91, ¶ 18 n.10, 236 A.3d 471.

## 2. Section 1 of the Initiative and the Contract Clause

[¶36]  The federal constitution's Contract Clause limits the enactment of laws impairing the obligation of contracts.  *See* U.S. Const. art. 1, § 10, cl. 1.  Its general purpose is "to encourage trade and credit by promoting confidence in the stability of contractual obligations" by "limit[ing] the power of the States to modify their own contracts as well as to regulate those between private parties."  *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 15, 17 (1977); *see also Rediscovering the Contract Clause*, 97 Harv. L. Rev. 1414, 1429 (1984) ("[T]he reasons motivating legislators to impair contractual obligations must relate to a diffuse public interest rather than merely to narrow factional ends. . . . Moreover, the imperative that government accommodate private expectations by acting only pursuant to rules fixed and announced beforehand demands that the legislature's discretion to repudiate the state's own obligations be strictly constrained." (footnotes and quotation marks omitted)).  This limitation applies not only to state legislatures but also to voters, who "may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation."  *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 295 (1981).

[¶37]  "Yet the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *U.S. Tr. Co.*, 431 U.S. at 17.  We therefore must determine if a particular exercise of legislative power justifies the impairment of a contract. *Id.* at 17, 21-22.

[¶38]  To do so, we use a three-step analysis: first, we determine if a legislative act results in a substantial impairment of a contractual relationship; if it does, we next identify the legislative purpose of that impairing act; then, we determine if that purpose justifies the alteration of the contracting parties' rights and responsibilities. *Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 38, 856 A.2d 1183; *see also Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-13 (1983).

[¶39]  Under the first step, we ask "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Kittery Retail*, 2004 ME 65, ¶ 38, 856 A.2d 1183 (quotation marks omitted).  To determine the degree of impairment, we consider several factors, including whether the subject matter of the contract is already regulated, whether the additional regulation was foreseeable, and whether the change in law affects the contract itself, as

opposed to the underlying subject matter. *Id.* ¶¶ 39-41. We may also consider the value of the contract and the extent to which the impairing law undermined the parties' contractual expectations. *See U.S. Tr. Co.*, 431 U.S. at 18-21.

[¶40] If a legislative act substantially impairs a contract, we next identify the legislative purpose of the impairing act. *See Kittery Retail*, 2004 ME 65, ¶ 38, 856 A.2d 1183; *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411-12; *U.S. Tr. Co.*, 431 U.S. at 21-22. As long as the State has not contracted away an essential attribute of sovereignty,[12] a public-purpose justification for a contractual impairment is required, to "guarantee[] that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 412; *see U.S. Tr. Co.*, 431 U.S. at 23. "We look to the plain language of a statute to discern the real purpose of the legislation." *Am. Republic Ins. Co. v. Superintendent of Ins.*, 647 A.2d 1195, 1197 (Me. 1994) (quotation marks omitted). We do so "to reconcile the strictures of the Contract Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens." *U.S. Tr. Co.*, 431 U.S. at 21 (quotation

---

12 If the impaired contract purports to bargain away an aspect of state sovereignty, the focus turns to "the State's power to create irrevocable contract rights in the first place, rather than [to] an inquiry into the purpose or reasonableness of the subsequent impairment." *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 23 (1977). No party contends that the 2020 lease implicates a matter of state sovereignty.

marks and citation omitted).  An impairing law "must have a significant and legitimate public purpose behind [it], such as the remedying of a broad and general social or economic problem."  *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411-12 (citation omitted).

[¶41]  Lastly, once we have identified the legislative purpose, we determine whether that purpose justifies the alteration of the contracting parties' rights and responsibilities.  *See Energy Rsrvs. Grp., Inc*, 459 U.S. at 412; *Kittery Retail*, 2004 ME 65, ¶ 38, 856 A.2d 1183; *see also U.S. Tr. Co.*, 431 U.S. at 22 ("Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.").  We will defer to the Legislature's judgment as to the necessity and reasonableness of economic or social regulation, unless, as here, the State is a contracting party.  *See Kittery Retail*, 2004 ME 65, ¶ 38, 856 A.2d 1183 (stating that no deference is owed if "the State . . . is a contracting party"); *see also U.S. Tr. Co.*, 431 U.S. at 25-26 ("[A]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose.  In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate [when] the State's self-interest is at stake.").

[¶42]  We now apply these principles to the instant case.  The contractual relationship at issue is defined in the 2020 lease.  Before the enactment of section 1 of the Initiative, the Bureau had been delegated the authority to freely lease public reserved land to "[s]et and maintain" transmission lines, so long as the term of the lease did not exceed twenty-five years.  12 M.R.S. § 1852(4) (2021).  Section 1 retroactively stripped the Bureau of that authority.  *See* I.B. 2021, ch. 1, § 1.  This impairs the lease between the Bureau and CMP for two reasons.  First, Section 1 essentially invalidates the lease as ultra vires—beyond the Bureau's authority.  Such an invalidation disrupts the longstanding contractual expectations between the Bureau and CMP.  It results in the total destruction of the parties' contractual expectations and is therefore a substantial impairment.  *See U.S. Tr. Co.*, 431 U.S. at 26-27.

[¶43]  Second, the new rule at the heart of Section 1 of the Initiative— that the Bureau is retroactively stripped of an authority it possessed at the time of the granting of both the 2014 and 2020 leases—was not foreseeable when the leases were granted.  The management of public reserved lands and the construction and operation of electric transmission lines are regulated activities, and therefore any regulations modifying the parties' rights and responsibilities under the lease should be reasonably foreseeable.  On this

point, Black contends that a lease provision which states that CMP "shall be in compliance with all Federal, State and local statutes, ordinances, rules and regulations, now or hereinafter enacted" is evidence that "the written instrument underlying [the contractual] relationship expressly contemplates" retroactive legislation. Although it may have been reasonably foreseeable that future legislation would *affect* the lease, it would be unreasonable to suggest that it was foreseeable, at the time of the execution of the lease (June 23, 2020), that a citizens' initiative (approved by voters on November 2, 2021) with a retroactivity provision dating back seven years would *completely invalidate* the lease.

[¶44] Having determined that Section 1 of the Initiative substantially impairs the lease between the Bureau and CMP, we next identify the legislative purpose of that part of the referendum, looking to the Initiative's plain language to do so. Section 1 is a relatively short provision, and its text reveals no clear purpose. The legal *effect* of the amendment is legislative oversight of actions the Bureau had previously been authorized to take. Black asserts that the purpose of the legislation is "additional environmental protections and legislative oversight." We assume, without deciding, that this is the Initiative's

legislative purpose.[13]  Because the State is a party to the impaired contract, the underlying legislative purpose is not entitled to the usual deference.  Black argues that full deference should still apply here because, although the State is a party to the lease, it derives no "financial benefit" from the impairment.  But the limitation on a state's ability to impair, through retroactive legislation, a contract to which it is a party applies regardless of whether the impairment benefits the State financially.  "[A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives.  *Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.*"  *U.S. Tr. Co.*, 431 U.S. at 30-31 (emphasis added).  There clearly was a more moderate course available here that would have promoted the alleged goals of

---

[13] The stated purpose of the Initiative is not specifically to prevent the Project from being built. *But see NECEC Transmission LLC v. Bureau of Parks & Lands*, No. BCD-CIV-2021-00058, 2021 Me. Bus. & Consumer LEXIS 2, at *19 (Dec. 16, 2021) ("Proponents of the Initiative included a political action committee, 'No CMP Corridor,' which repeatedly stated that the purpose of the Initiative was to stop the Project.").  Project opponents tried that direct approach in a 2020 initiative that impermissibly targeted the PUC's authorization for this Project.  *Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 35, 237 A.3d 882.  The State has a long-standing, multifaceted permitting process through which several state agencies and impacted local governments authorize electric transmission lines.  The 2021 Initiative did not purport to reverse a particular decision from a state agency or commission, as the first initiative did.  But the 2021 Initiative's language affected no agency subject to the Designated Lands statutes other than the Bureau; affected no activity allowed on designated lands other than the construction of transmission lines and other linear projects on public reserved lands; and made section 1 retroactive to September 16, 2014—a date that appears to have relevance only because it predates the execution of the 2014 lease.  Opponents have swapped a targeted directive in the first initiative for a nominally nontargeted retroactive mandate in the one before us now.

environmental protection and legislative oversight—to make the statutory change prospective only and require legislative approval for all future transmission line leases on public lands. Of course, if the true purpose of the Initiative was to stop the Project, that more moderate course would not have been sufficient.

[¶45]   Finally, we must determine whether the need for additional legislative oversight justifies the alteration of the contracting parties' rights and responsibilities. In making that determination, we must consider the state's authority to enter into the agreement in the first instance. *See U.S. Tr. Co.*, 431 U.S. at 21-24.

[¶46]   Black has offered no reason why the Initiative's purpose to increase legislative oversight and environmental protection of public reserved lands justifies the invalidation of the parties' lease and every other lease that the Bureau has granted since 2014 for projects within the scope of section 1 of the Initiative. No emergency gave rise to section 1 of the Initiative, nor does it remedy any broad and general social or economic problem. Over the years, the Bureau has granted hundreds of leases and licenses of public reserved lands. The Bureau granted all these leases and licenses without engaging in any rulemaking or other public administrative process. Through the Initiative, the

legislative power has reached back in time to destroy at least one lease and to put the validity of hundreds more into question, all without any showing of necessity for such drastic action.

[¶47] Based on the lack of any "significant and legitimate" countervailing public purpose to justify the voiding of the 2020 lease, we conclude that the Contract Clause does not permit the impairment caused by section 1 of the Initiative. *See Energy Rsrvs. Grp., Inc*, 459 U.S. at 411-12; *see U.S. Tr. Co.*, 431 U.S. at 26-27; Me. Const. art. 1, § 11. Accordingly, the 2020 lease was not voided by the Initiative, and CMP's and the Bureau's appeals remain justiciable. Black's motion to dismiss these appeals as moot is therefore denied. As a result, in addressing the remaining issues, we apply the law as it was prior to the Initiative, codified at 12 M.R.S. § 1852(4) (2021).

### E.     Requirements Applicable to the Bureau's Granting of Leases of Public Reserved Lands

[¶48] We now address Black's contention and the trial court's ruling that article IX, section 23 of the Maine Constitution and the Designated Lands statutes required the Bureau to follow a "public administrative process" before granting the 2020 lease.

### 1. The Bureau's Leasing Authority Generally

[¶49]  Prior to the ratification of article IX, section 23, public reserved lands could be leased and were managed under multiple-use principles by the Bureau's predecessor agency.  *See* P.L. 1987, ch. 737, pt. B, § 2 (effective Mar. 1, 1989) (codified at 12 M.R.S.A. § 585(1), (2)(A), (4) (Supp. 1988)).  That agency realized these management objectives through the creation of comprehensive management plans and specific action plans, and it was authorized to lease public reserved lands for electric power transmission for up to a twenty-five-year term if that action was consistent with the management plans for the leased area.  P.L. 1987, ch. 737, pt. B, § 2 (effective Mar. 1, 1989) (codified at 12 M.R.S.A. § 585(3), (4)(C) (Supp. 1988)).

[¶50]  The ratification of article IX, section 23 in 1993 did not directly amend this statutory scheme, but the Legislature could no longer delegate to executive agencies, including the Bureau, the authority to reduce or substantially alter the use of designated lands.  Furthermore, as the trial court described, the constitutional amendment "[took] back from the executive branch authority previously delegated to it by the Legislature. . . . [W]hat was taken back was the final say as to whether public reserved lands could be sold, and—pertinent here—whether the uses of the public lands could be

'substantially altered.'"  In other words, the executive branch was still authorized to grant utility leases, but only if those leases did not reduce or substantially alter the uses of designated land.

[¶51]  After the passage of the constitutional amendment, the Legislature enacted implementing legislation, the Designated Lands statutes, in which it defined the term "substantially altered."  *See* 12 M.R.S. § 598(5).

> "Substantially altered," in the use of designated lands, means changed so as to significantly alter physical characteristics in a way that frustrates the essential purposes for which that land is held by the State.

*Id.*  None of the parties argues that the Legislature's definition does not comport with the letter and intent of the constitutional term, so we accept the Legislature's definition for purposes of this analysis.  There are two issues that must be resolved when applying this definition: (1) whether a change in use significantly alters the physical characteristics of the land and, if so, (2) whether that alteration frustrates the essential purposes for which the land is held.  *See id*.

[¶52]  The Bureau argues that the Legislature's statutory scheme reflected the Legislature's view that no utility lease could ever be deemed to result in a substantial alteration of the use of public reserved land—even if, for example, a combination of utility leases occupied the entirety of a tract of public

reserved land. We cannot logically assume that the Legislature ever endorsed this view. The essential purpose of public reserved lands is multiple-use management that achieves a sustained yield of products and services. *Id.* §§ 598(5), 1847(1); *see also id.* § 1845(1)(D). Multiple-use management requires the Bureau to catalog the various resources of a particular public lot; to develop a management plan that "provide[s] for the demonstration of appropriate management practices that will enhance the timber, wildlife, recreation, economic and other values of the lands," *id.* § 1847(2); and to manage that lot in such a way that no single purpose frustrates the others and impairs the land's productivity, *see id.* § 1845(1)(D), (2). Considering this management scheme together with the requirements imposed by article IX, section 23, a lease could so significantly alter the physical characteristics of a public lot that it would result, practically speaking, in the Bureau managing the land for that purpose at the expense of all others. *See id.* § 1847(1)-(2). Thus, the Legislature's continued delegation of authority to grant utility leases on public reserved lands did not mean that the Legislature deemed that any such lease could never result in a "substantial alteration" of use. Instead, the statutory scheme requires the Bureau to decide on a case-by-case basis

38

whether it has authority to lease public reserved land for utility transmission lines.

## 2. The Bureau's Authority to Grant the 2020 Lease Without Any Formal Administrative Process

[¶53] In this case, our conclusion that the Bureau did not have blanket authority to grant a lease for a utility transmission line without determining for itself whether the lease would substantially alter public reserved lands does not mean that the Legislature required the Bureau to make that determination pursuant to any particular administrative process. Neither article IX, section 23 of the Maine Constitution, nor any statute, nor any decision by this Court, explicitly requires the Bureau to make a determination regarding substantial alteration pursuant to a public administrative process before granting a utility lease on public reserved lands. *See* Me. Const. art. IX, § 23; 12 M.R.S. §§ 598 to 598-B, 1852(4)(A) (2022); 12 M.R.S. § 1852(4)(A) (2021).

[¶54] Indeed, the Bureau's general authority to "take actions on the public reserved lands," including granting leases, could hardly be more broad and sweeping: "The director may take actions on the public reserved lands consistent with the management plans for those lands and *upon any terms and conditions and for any consideration the director considers reasonable.*" 12 M.R.S. § 1847(3) (emphasis added). The delegation of leasing authority

specific to leases for utility transmission lines was equally broad prior to the passage of the Initiative. *See* 12 M.R.S. § 1852(4) (2021).

[¶55]   The Legislature clearly could have constrained the Bureau's authority to grant leases of public reserved lands in the manner that it has done for other agency action, such as leasing submerged public lands. *See* 12 M.R.S. § 6072 (2022).   The Legislature has required the Department of Marine Resources (DMR) to follow an adjudicatory-type process pursuant to the Maine Administrative Procedure Act in granting aquaculture leases. *Id.* § 6072(6) ("Prior to granting [an aquaculture] lease, the commissioner shall hold a hearing.  The hearing shall be an adjudicatory proceeding and shall be held in the manner provided under the Maine Administrative Procedure Act . . . ."); *see also* 12 M.R.S. § 6001(13).  Because the aquaculture lease statute designates the lease procedure as adjudicatory, the statute requires notice and a written decision and requires DMR to promulgate the rules under which it will exercise its leasing authority. *See id.* §§ 6072(6)(B) ("Under the provisions of Title 5, section 9052, the leasing procedure must require notice to the general public."), 6072(7-A) ("In evaluating the proposed lease, the commissioner shall take into consideration the number and density of aquaculture leases in an area and may grant the lease if the proposed lease meets the following conditions as defined

by rule."), 6072(10)(B) (requiring the Department to provide notice of the granting of a lease to riparian owners, intervenors, and the municipality in which the lease was granted). In the same manner, the Legislature has required the Bureau to provide notice, receive comment, and hold hearings in other public lands contexts. *See, e.g.*, *id.* §§ 1814-A (easements across rail tracks), 1837(2) (sale of nonreserved public lands).

[¶56] Although there are such requirements now, at the time of these leases there was no similar set of requirements for the Bureau's granting of leases for public reserved lands.[14] *See* Me. Const. art. IX, § 23; 12 M.R.S. §§ 598

---

[14] During the spring of 2022, the Maine Legislature passed L.D. 1075, An Act to Protect Public Lands, which requires the Bureau to adopt rules for determining whether a proposed activity will reduce or substantially alter the use of designated lands under the Bureau's jurisdiction, but the law was not in effect at the time of the execution of the 2020 lease. *See* P.L. 2021, ch. 654 (effective Aug. 8, 2022); L.D. 1075 (130th Legis. 2022); Comm. Amend. A to L.D. 1075, No. S-493 (130th Legis. 2022). This new law enacted 12 M.R.S. § 598-C, which provides, in full:

> §598-C. Process for determination of reduction or substantially altered use of designated land
>
> The Department of Agriculture, Conservation and Forestry, Bureau of Parks and Lands shall adopt rules to establish an objective evaluation process for determining if a proposed activity on land designated under this chapter and under the jurisdiction of the bureau would cause the land to be reduced or the uses of the land to be substantially altered. In adopting the rules, the bureau shall observe the requirements relating to designated lands in the Constitution of Maine, Article IX, Section 23 and ensure proper exercise of the bureau's public trust responsibility. These rules must also include provisions for public notice and comment before authorizing any such activity and for determining the appropriate instrument to be used to authorize that activity, including but not limited to whether an easement, lease, license or other instrument should be used. Rules adopted pursuant to this section are major substantive rules as defined in Title 5, chapter 375, subchapter 2-A.

to 598–B (2022); 12 M.R.S. § 1852(4) (2021); *cf.* 12 M.R.S. §§ 1814–A(1), (4), 1837(2), 1847(2), 1851(3), (4) (2022).

[¶57]  More fundamentally, a government agency's execution of a lease of government property, including land, is neither adjudicatory nor otherwise subject to a formal administrative process unless the legislative delegation of leasing authority to an agency requires otherwise, as in the case of aquaculture leases.  *See, e.g.*, *Ala. Aircraft Indus. v. United States*, 82 Fed. Cl. 757, 773 n.14 (2008) ("Decisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing.  Nor are they formal rulemakings." (quotation marks omitted)); *Sierra Club v. Comm'r of the Dep't of Envtl. Mgmt.*, 791 N.E.2d 325, 332-33 (Mass. 2003) (agency's approval of lease modification was an exercise of legislatively delegated authority, not an adjudication); *Flores v. Bd. of Land & Nat. Res.*, 424 P.3d 469, 479-483 (Haw. 2018) (agency not required to hold hearing on whether to consent to a sublease); *see also Haverhill Manor, Inc. v. Comm'r of Pub. Welfare*, 330 N.E.2d 180, 190 (1975) ("The APA provisions applicable to adjudicatory proceedings are . . . inapposite, since in the instant circumstances a hearing is not required by constitutional right or by any provision of the General Laws." (citations and quotation marks omitted)).

[¶58]   At the time the 2020 lease was granted, there was nothing requiring the Bureau to promulgate rules for granting leases of public reserved lands.  When the Bureau granted the lease, it was authorized to grant leases of public reserved land for transmission lines on any terms it deemed reasonable, so long as the leases did not reduce or substantially alter public reserved lands.

[¶59]  Our conclusion that the Bureau was not required to issue findings or conduct any other "public administrative process" when it granted the 2020 lease does not preclude review of the leasing decision pursuant to Rule 80C and the Maine Administrative Procedure Act.  The agency decisions reviewable under the Maine Administrative Procedure Act are not limited to the adjudicatory proceedings and decisions for which hearings and findings are required. *See Davric Me. Corp. v. Me. Harness Racing Comm'n*, 1999 ME 99, ¶ 11, 732 A.2d 289 (Rule 80C review of state harness racing commission's nonadjudicatory decision to certify election results).  The Federal Circuit has observed that "the [federal] Administrative Procedure Act does not itself require an agency to explain the basis for its decision, unless an adjudication required to be made on the record or a formal rulemaking is involved. . . . [but] even if the agency is not obligated to provide reasons, a court may nonetheless order the agency to provide explanation if such an explanation is required for

meaningful judicial review." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337-38 (Fed. Cir. 2001); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971) ("[T]he Administrative Procedure Act requirements that there be formal findings in certain rulemaking and adjudicatory proceedings do not apply to the Secretary's action here.")

[¶60]  We conclude that, under the law in effect in 2014 and 2020, the Bureau was legislatively authorized to grant leases of utility transmission lines on public reserved lands that would not reduce or substantially alter the lands, without giving public notice, conducting hearings, adopting findings of fact and conclusions of law, or engaging in any of the other attributes of a public administrative process.

[¶61]  This delineation of the Bureau's leasing authority establishes, in turn, that the scope of judicial review of the grant of the 2020 lease is limited. No formal process was required in connection with the grant of the 2020 lease, and we do not review for compliance with nonexistent procedural requirements.  Instead, our review is limited to deciding whether the Bureau's grant of the 2020 lease was ultra vires because the lease would result in a substantial alteration of public reserved land and therefore had to be approved by the Legislature.  We now turn to that question.

**F.    The Validity of the 2020 Lease in Light of the Bureau's Leasing Authority**

[¶62]  Although Black's brief frames one of the issues as whether the leases reduce or substantially alter public reserved lands, the brief does not develop any argument that the leases reduce any public reserved lands, and in fact notes that "[t]he Bureau concedes that neither a lease nor an easement conveys any land and therefore the acreage in both cases remains the same, as it must."  *See* 12 M.R.S. § 598(4) ("'Reduced' means a reduction in the acreage of an individual parcel or lot of designated land . . . .").  Black's ultra vires claim argues only that the leases "substantially alter," and not that they reduce, public reserved lands.

[¶63]  A threshold question is whether the current record is sufficient to enable us to resolve Black's ultra vires claim.  The Bureau's and CMP's briefs ask us to vacate the judgment and remand for entry of a judgment affirming the Bureau's decision to grant the 2020 lease, and CMP proposes several alternatives to that outcome.  Black's brief asks us to affirm the Superior Court's decision vacating the 2020 lease, and alternatively seeks a remand for the trial

court "to take evidence"[15] and decide the constitutional question of the Bureau's authority.

[¶64]  It is important to note that in assessing whether the Bureau's granting of the 2020 lease was ultra vires, we are applying the law as it existed at the time the 2020 lease was granted.  *See* 12 M.R.S. § 1852(4) (2021).  The Initiative and resulting legislation effectively takes away for all future contracts and leases the Bureau's authority to make a determination regarding whether a lease would cause a "substantial alteration," stating that "[a]ny . . . transmission lines . . . are deemed to substantially alter the uses of the [public] land . . . and a lease or conveyance for the purpose of constructing and operating such . . . transmission lines . . . may not be granted without first obtaining the vote of 2/3 of all the members elected to each House of the Legislature."  I.B. 2021, ch. 1, § 1.  We held above that applying the provisions of the Initiative to the 2020 lease would substantially impair it and therefore be in violation of the Contract Clause.  *See supra* ¶ 47.  Accordingly, we apply the facts contained in the record to the law in effect prior to the 2020 lease to

---

[15] Black does not specify what evidence he would proffer on remand.  Elsewhere, his brief asserts that "never in any proceeding at any level were Plaintiffs allowed to submit evidence, other than through existing public documents," but the docket in this case does not indicate that Black ever filed any motion for the taking of additional evidence pursuant to M.R. Civ. P. 80C(e).

46

determine whether the 2020 lease results in a substantial alteration of the use of the public lands in question. We turn now to that analysis.

[¶65] As we discussed above, there are two issues that must be resolved when making a determination regarding whether a lease would cause a "substantial alteration": (1) whether a change in use significantly alters the physical characteristics of the land and, if so, (2) whether that alteration frustrates the essential purposes for which the land is held. *See* 12 M.R.S. § 598(5).

[¶66] The relevant facts in the administrative record are free of ambiguity or dispute. The two tracts of public reserved lands in question— Johnson Mountain and West Forks Plantation—occupy a combined area of 1,241 acres in the Upper Kennebec Region. A.R. II0014, II0093; A.R. IV0029-38.[16] Their physical characteristics include water bodies, wetlands, and primarily standing timber. A.R. II0093, II0223-24. There are no unique features or protected areas on either tract. A.R. II0015, II0018-19, II0095, II0219. Their predominant use has been for timber harvesting every twenty years, but there are also recreational facilities and an existing 100-foot-wide,

---

[16] The A.R. citations throughout this section refer to the Administrative Record filed in conjunction with this case, which spans seven volumes and hundreds of pages.

three-mile-long utility transmission line on the tracts. A.R. II0093, II0235-38. The essential purposes of the tracts are to support the multiple uses currently being made of them consistent with the Bureau's management plans.

[¶67] Before agreeing to grant the 2014 lease, the Bureau considered locating CMP's transmission line within the clearing that contains the existing line on the tracts, but decided against it because of the adverse environmental impacts that it would cause. A.R. III0033. The Bureau also performed field work and persuaded CMP to avoid stream crossings and reduce the total area covered by the lease. A.R. III0181-82, III0208-10, III0233-38. As granted, the 2020 lease concerns 32.39 acres, or 2.6% of the combined area of the public reserved lands and would accommodate a 0.9-mile-long section of the Project. A.R. I0001, I0013; A.R. II0093. Accordingly, the section of the Project on the tracts would be wider, but shorter, than the existing transmission line corridor. The 2020 lease includes provisions limiting road construction and protecting forest resources and vernal pools. A.R. I0004-06.

[¶68] Construction of a transmission line as permitted by the 2020 lease will necessarily result in the significant alteration of the 32.39 acres that it actually encompasses, but that alone is not the test. The clause "significantly alter[s] physical characteristics in a way that frustrates the essential purposes

for which that land is held" means that the proposed activity will have that major effect either because it will occupy such a large portion of the public reserved land or because it will change the physical characteristics of the public reserved land well beyond the area that it occupies. Given the uses, physical characteristics, and essential purposes of the Johnson Mountain and West Forks Plantation tracts, we see no reasonable basis for deciding that a second utility transmission line occupying 2.6% of the combined tracts could significantly alter the physical characteristics of so much of the remaining 97.4% that the multiple-use purposes for which the tracts are held would be frustrated.

[¶69] In a Rule 80C appeal we review the agency's actions directly, without deference to the trial court's decision, and compare them against the record evidence to determine whether the agency's actions were in excess of their statutory authority and therefore ultra vires. *See Anderson*, 2009 ME 134, ¶ 2, 985 A.2d 501; *Sold*, 2005 ME 24, ¶ 12, 868 A.2d 172. Because we conclude that the evidence contained in the record is sufficient, we see no reason to impose a further burden on the parties' time and resources by remanding for the Bureau to take further evidence. We conclude that the record establishes

that the Bureau acted within its constitutional and statutory authority in granting the 2020 lease.

The entry is:

> Judgment vacated. Remanded for entry of a judgment, consistent with this opinion, for the Bureau of Parks and Lands, NECEC Transmission LLC, and Central Maine Power Co. on all counts of the first amended complaint.

---

Aaron M. Frey, Attorney General, Lauren E. Parker, Asst. Atty. Gen. (orally), Scott W. Boak, Asst. Atty Gen., and Laura E. Jensen, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellant Bureau of Parks and Lands

Nolan L. Reichl, Esq. (orally), Jared S. des Rosiers, Esq., and Kyle M. Noonan, Esq., Pierce Atwood LLP, Portland, for appellants and cross-appellees Central Maine Power Company and NECEC Transmission LLC

James T. Kilbreth, Esq. (orally), David M. Kallin, Esq., Jeana M. McCormick, Esq., and Sara P. Cressey, Esq., Drummond Woodsum, Portland, for appellees and cross-appellants Russell Black, Richard A. Bennett, Thomas B. Saviello, Kent Ackley, Seth Berry, Chad Grignon, Denise Harlow, Margaret O'Neil, William Pluecker, Edwin Buzzell, Greg Caruso, Charlene Cummings, Robert Haynes o/b/o Old Canada Road National Scenic Byway, Cathy Johnson, Ron Joseph, John R. Nicholas Jr., George A. Smith, Clifford Stevens, Todd Towle, and the Natural Resources Council of Maine

Timothy C. Woodcock, Esq., and Jonathan A. Pottle, Esq., Eaton Peabody, Bangor, for amicus curiae Maine Forest Products Council

Orlando E. Delogu, amicus curiae pro se

50

P. Andrew Hamilton, Esq., and Casey M. Olesen, Esq., Eaton Peabody, Bangor, for amicus curiae H.Q. Energy Services (U.S.) Inc.

Sigmund D. Schutz, Esq., Anthony W. Buxton, Esq., and Jonathan Mermin, Esq., Preti Flaherty Beliveau & Pachios LLP, Portland, for amicus curiae Joshua Reynolds

James G. Monteleone, Esq., Bernstein Shur, Portland, for amici curiae Troy Jackson, Ben Chipman, Eloise Vitelli, Craig Hickman, Chloe Maxmin, Scott Cyrway, Paul Davis, Patrick Corey, and Jennifer Poirier

Business and Consumer Docket docket number CV-2020-29
FOR CLERK REFERENCE ONLY